**QUAKER STATE OIL REFINING CORPORATION, Plaintiff,**

v.

**BURMAH–CASTROL, INC., Defendant.**

**No. 80 CIV. 5451 (CBM).**

United States District Court,
S. D. New York.

Oct. 17, 1980.

Weil, Gotshal & Manges by Robert G. Sugarman, New York City, for plaintiff.

Paul, Weiss, Rifkin, Wharton & Garrison by Paul J. Newlon, New York City, for defendant.

MOTLEY, District Judge.

On September 26, 1980, plaintiff, Quaker State Oil Refining Corporation (Quaker State), filed a complaint against defendant, Burmah-Castrol, Inc. (Castrol) alleging violations of the Lanham Act, 15 U.S.C. § 1121, and various state laws in connection with two of Castrol's television commercials. Plaintiff requested preliminary and permanent injunctive relief. A hearing was held on September 26, 1980, to consider plaintiff's request for a temporary restraining order. This court concluded that the evidence before the court was insufficient to support a temporary restraining order, and the request was denied. On October 6, 1980, a hearing was begun on plaintiff's request for a preliminary injunction. The hearing consumed large portions of the next five days. On October 10, 1980, a preliminary injunction was entered along with findings of fact and conclusions of law. The opinion and order were actually filed the following Tuesday, October 14, 1980, since the opinion was handed down at approximately 7:30 P.M. on the Friday before the Columbus Day weekend. On October 15, 1980, defendant moved to amend the findings of fact and conclusions of law, and to modify the preliminary injunction. Plaintiff filed opposing papers, and a hearing was held on October 17, 1980. Upon consideration of the evidence this court grants the motion in so far as it seeks to amend the findings of fact and conclusions of law, and denies the motion in so far as it seeks to modify the preliminary injunction. The amended findings of fact and conclusions of law in this opinion supercede the findings of fact and conclusions of law contained in the opinion filed October 14, 1980.

## AMENDED

## FINDINGS OF FACT

1. Quaker State Oil Refining Corporation ("Quaker State") and Burmah-Castrol, Inc. ("Castrol") compete in the sale of motor oils.

2. Motor oils are classified in various ways, one of which is the SAE (Society of Automotive Engineers) viscosity classification system.

3. One of the SAE viscosity classifications is "10W-40" and both Quaker State and Castrol market 10W-40 oils which directly compete with each other in interstate commerce and within the Southern District of New York—Quaker State DeLuxe 10W-40 ("QUAKER STATE DELUXE") and Castrol GTX 10W-40 ("CASTROL GTX").

4. Castrol is presently running two commercials in which CASTROL GTX is compared to QUAKER STATE DELUXE. These commercials can be referred to as the "Graph Commercial" (PX 2)[1] and the "Cans Commercial" (PX 1-A).

5. The Graph Commercial first pictures old large cars having difficulty running; then new small cars running without difficulty. The audio in this portion of the commercial states:

"Yesterday's cars with their large V-8 engines didn't demand so much of a motor oil. But today's smaller cars with their higher revving, hotter four and six cylinder engines can make an oil lose viscosity. That's why they need Castrol."

6. The Graph Commercial then shows a graph with 3 cars starting at different points on the left axis and facing in a horizontal direction. One car is labeled "C" for Castrol, one "Q" for Quaker State and one "P" for Pennzoil. The Castrol car proceeds horizontally across the graph while the Quaker State and Pennzoil cars fall precipitously to the bottom of the graph. The audio in this portion of the commercial states: "In an independent L-38 laboratory test of these SAE 10W-40s, only Castrol showed no significant loss of viscosity."

7. The Graph Commercial ends with the small cars passing the large cars and super-

1. Plaintiff's exhibits will be referred to as "PX ___." Defendant's exhibits will be referred to as "DX ___."

imposes the statement: "The oil engineered for smaller cars." The audio in this portion of the commercial states: "So for today's smaller cars, use the oil that keeps up with the times, Castrol."

8. The Cans Commercial starts with the identical large car—small car video and the same audio described for the Graph Commercial in paragraph 5 above.

9. Instead of the graph, the Cans Commercial then shows a CASTROL GTX can knocking a QUAKER STATE DELUXE can off the table. The audio in this portion of the commercial states: "That's why they need Castrol Motor Oil. An independent lab test reveals that unlike Quaker State, Castrol does not lose viscosity."

10. The Cans Commercial continues with the same video and superimposition described in paragraph 7 above and states: "So for today's smaller cars, make sure your motor oil has kept up with the times, Castrol."

11. The Cans Commercial concludes with a picture of CASTROL 10W–30 oil and states: "Now save gas with Castrol GTX 10W–30. Available at popular prices."

12. The ability to lubricate the engine is one of the important functions of a motor oil. If the viscosity is too high, the oil will be too thick for proper lubrication. If the viscosity is too low, the oil will be too thin for proper lubrication. (DeLong Aff. ¶ 13)

13. In order to improve viscometric properties, polymers called viscosity index improvers ("VI improvers") are added to the motor oil. (DeLong Tr. 240)[2]

14. Motor oils are subject to two types of viscosity loss—permanent and temporary. Permanent viscosity loss occurs when the molecules of the VI improvers break. Temporary viscosity loss occurs when the molecules of the VI improvers bend or align but do not break under stress and then return to their original shape. (DeLong Tr. 241; Selby Tr. 248, 249; DX C)

15. All multigrade motor oils suffer temporary viscosity loss and this loss is suf-

fered immediately on ignition of the engine. (Selby Tr. 452, 453)

16. CASTROL GTX suffers a temporary viscosity loss of 13% under certain conditions. (DX J)

17. The statement in the Cans Commercial that "An independent lab test reveals that unlike Quaker State, Castrol does not lose viscosity" is false on its face. This court understands defendant's position that an independent lab test, an L–38 test performed by Southwest Research Institute, shows no *permanent* viscosity loss by Castrol after a certain test interval. Nevertheless, the statement, currently found in the Cans Commercial may be fairly read to mean that Castrol never loses viscosity even temporarily in an operating engine. The evidence disclosed that that statement cannot be made of any multi-grade oil.

18. The L–38 laboratory test only measures permanent viscosity loss (Selby Tr. 588) and bears no correlation to the performance of a motor oil in an operating engine. (DeLong Tr. 242, 243)

19. The L–38 laboratory test measures whether a motor oil stays within an SAE classification. (DeLong Tr. 242)

20. The SAE classification for a 40 weight oil ranges from 12.5 centistokes ("cSt") to less than 16.3 cSt. (DeLong Aff. Exh. 2)

21. QUAKER STATE DELUXE stays in the 40 weight classification when measured in an L–38 test. (DX F, DeLong Tr. 243)

22. (a) The significant factor in determining whether an oil provides sufficient viscosity is the level of viscosity, not the loss of viscosity. (Selby Tr. 608; Stambaugh Tr. 373, 374; DeLong Tr. 241, 242; DX A, p. 10) Certain oils can lose more viscosity than other oils and still remain at a higher level of viscosity because of the initial blending of the oil. (Selby Tr. 585, 609; Stambaugh Tr. 374)

---

**2.** Transcript references will be identified with the name of the witness and the transcript page.

(b) There is some critical level of viscosity. If the viscosity falls below that level there is the danger that engine damage may result. As long as the viscosity stays above the critical level the engine will be protected and any differences between the levels of viscosity of different oils are not significant. (Selby Tr. 558, 559; Stambaugh Tr. 362)

(c) There is no agreement as to where the critical viscosity level should be. (Selby Tr. 468, 570, 571; Stambaugh Tr. 362) Estimates of the level have ranged from 3.0 cSt (Selby Tr. 626) to 3.2 cSt (DeLong Tr. 292) to 4.5 cSt. (DX D)

23. Defendant's evidence that 4.5 cSt is the critical viscosity level consists of correlating results from two different scientific studies. Defendant's own expert, Mr. Selby, explained that these two sets of data could properly be correlated, despite documentary evidence indicating that they were obtained under different laboratory conditions. He stated that the results obtained bore a close relationship, and that either his analysis was incorrect, or one of the researchers who performed the tests had misread his instruments. This apparent contradiction severely limits the weight which this court can give to defendant's evidence relating to critical viscosity levels.

24. Plaintiff has introduced a consumer survey consisting of questionnaires administered to persons who were shown a videotape of the Graph Commercial. This survey evidence persuasively demonstrates the capacity of the Graph Commercial to mislead consumers. Sixty-nine percent of the people questioned agreed with the statement that "Castrol motor oil protects your engine better than Pennzoil or Quaker State motor oil because it doesn't lose viscosity." Eighty-four percent of the persons questioned indicated that they interpreted the word "significant" to mean a viscosity loss of more than 10%; 68.2% indicated that they thought "significant" meant a viscosity loss of more than 20%.

25. The use of the word "significant" in the Graph Commercial is misleading because it suggests that there is a crucial viscosity level which Quaker State falls below resulting in a materially increased chance of engine damage. While Quaker State clearly does suffer greater viscosity loss than Castrol, Quaker State complies with currently applicable motor oil standards. There is no current agreement within the motor oil or automobile industry that the viscosity difference between Castrol and Quaker State creates a significantly greater chance of engine damage. The evidence introduced by Castrol to establish a new viscosity standard is not conclusive.

26. The evidence indicates that today's small car engines do not run hotter than today's large car engines. The only evidence introduced by defendant to support its statement that small cars run hotter is the opinion testimony of its expert witness, Mr. Selby. In response, plaintiff has offered the following evidence:

(a) testimony which describes a test demonstrating that the temperature rise in the bearings of a small engine (2.3 liter) is lower than that in a 350 cubic inch V–8 engine. (Tr. 381–385)

(b) testimony that Ford Motor Company specifies longer drain intervals for its four cylinder engines than for its V–8's because of a less severe oxidation effect which in turn indicates lower temperature. (Tr. 262–63, 367–68)

(c) testimony that auto manufacturers do not specify special oils for use in small cars. (Tr. 265, 630)

(d) testimony by defendant's expert, Mr. Selby, on cross examination that two European manufacturers of small cars, Volkswagon and British Leyland, are considering specifying 3 to 3.2 cSt as the critical viscosity level for motor oils used in their cars. (Tr. 629)

(e) testimony that particular small cars may run cooler than large cars for a variety of reasons including bearing design and favorable power to weight ratios. (Tr. 261–62).

27. Plaintiff's consumer survey demonstrates that an overwhelming percentage of

the people who viewed the Graph commercial interpreted the commercial to say that small cars run hotter than large cars.

28. Today's cars, whether small or large, run hotter than the cars of 10 or 20 years ago due to the addition of various power extras. (DX I)

## AMENDED CONCLUSIONS OF LAW

■ Before a preliminary injunction can issue, plaintiff must demonstrate:

"(A) irreparable harm, and (B) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly toward the party requesting the preliminary relief."

*Jackson Dairy Inc. v. J. P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979). In a preliminary injunction action involving alleged Lanham Act violations, if any of the advertising at issue is false on its face, relief may be granted without reference to survey data indicating that consumers were actually misled, and irreparable injury may be presumed. *Phillip Morris Inc. v. Loew's Theatres, Inc.*, 80 Civ. 4082 (S.D.N.Y. July 26, 1980); *Johnson & Johnson v. Carter-Wallace*, 631 F.2d 186 (2d Cir., 1980) (No consumer survey data necessary to grant permanent injunctive relief in Lanham Act cases when advertisements at issue are actually false). If an advertisement is not facially false, then plaintiff must demonstrate that consumers receive false or misleading impressions from the advertisement by use of expert testimony and survey research data. *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160 (2d Cir. 1978).

■ Based on the facts stated, Quaker State is entitled to a preliminary injunction. Quaker State has established a likelihood of success on the merits for its claims concerning both the Cans and Graph Commercials. The statement that Castrol does not lose viscosity is literally false. Quaker State has demonstrated a likelihood that it will prove the falsity of Castrol's claims that (1) small cars run hotter than large cars and (2)

Quaker State loses significant amounts of viscosity. Irreparable injury may be presumed with respect to the portion of the Cans Commercial which is actually false. Survey evidence demonstrates that consumers are being misled by the Graph Commercial. Irreparable injury is clearly present with respect to the Graph Commercial because, as Judge Sweet recently stated in a similar matter:

Brand loyalty would be affected and by its very nature would remain incalculable.... Further, there is convincing evidence that consumers are being deceived ... and the [plaintiff's] reputation ... among consumers will thereby suffer injury ... Finally, and most significantly, it is the public as well as the competitor which is to be protected from deceptive advertising, and only injunctive relief can prevent that irreparable injury. *Phillip Morris, Inc. v. Loew's Theatres, Inc.*, Slip Opinion at 8, 80 Civ. 4082 (S.D.N.Y. July 26, 1980) (Citations omitted)

Therefore, a Preliminary Injunction will issue.