**The STIFFEL COMPANY, Plaintiff,**

**v.**

**WESTWOOD LIGHTING GROUP, Defendant.**

Civ. A. No. 87–523.

United States District Court, D. New Jersey.

March 19, 1987.

Hugh Latimer, Wald, Harkrader & Ross, Washington, D.C., and Thomas J. Spies, Walder, Sondak, Berkeley & Brogan, P.A., Roseland, N.J., for plaintiff.

Steven P. Pokotilow, Blum, Kaplan, New York City, and Richard Wilkinson, Lowenstein, Sandler, Brochin, Kohn, Fisher & Boylan, Roseland, N.J., for defendant.

## OPINION

LECHNER, District Judge.

This matter was commenced by The Stiffel Company ("Stiffel") against Westwood Lighting Group ("Westwood") seeking temporary, preliminary and permanent injunctive relief to prevent injury to Stiffel's business as a result of Westwood advertising alleged to be in violation of the Lanham Trademark Act, 15 U.S.C. §§ 1125(a) and 1117 (the "Lanham Act"). (Complaint, ¶ 1.) It appears this court has jurisdiction under 28 U.S.C. §§ 1331 and 1338 for the alleged violation of the Lanham Act.

On the return date of the Order to Show Cause, February 24, 1987, Stiffel, through its counsel, stipulated that only one issue would be the subject of argument—that the advertising by Westwood is false or misleading.[1] It appears Westwood has

---

1. See Transcript, dated February 24, 1987, at 3 (hereinafter "Transcript at "). Stiffel's oth-er contentions concerning the efficacy of Westwood's testing were not submitted to the court.

caused to be published and disseminated, a series of advertisements concerning its lamps. (Complaint Exhibits A through C.) Stiffel alleges these advertisements are false or misleading in that certain claims of superiority made by Westwood in the advertisements are not supported by testing referred to in the ads. (Complaint, ¶¶ 1, 7, 8 and 10; Transcript at 3 and 4.) The first advertisement appeared on January 5, 1987 in a trade publication. It states:

Westwood out-performs with WestPro

Out-performs the competition including STIFFEL

Westwood's revolutionary breakthrough in quality finishing technology has been proven in test after test. See it for yourself at the January markets.

QUALITY CONTROL

From start to finish, Westwood lamps reflect state-of-the-art engineering and superior quality. It begins with pure base metal that must pass our exclusive, monitored purity test *before* it is melted down and cast. Sophisticated equipment closely inspects temperature and purity of melt, enabling us to create "the perfect base" for the brass plating. Now, through a major step in chemical engineering, we can achieve better and thicker brass plating. Our new filtering system gives us plating solutions superior to those used by other manufacturers.

WESTPRO ... THERE'S NOTHING LIKE IT!

Casting the glow of quality and beauty of design that comes from the best materials and methods, Westwood has reached a new level of achievement. The results are a flawless lacquer finish that makes Westwood brass lamps better than ever ... better than the competition. Where quality prevails and value counts, we met the challenge. The results have been tested over and over again. The proof is here and now. Check it out for yourself ... THE WESTPRO SYSTEM, a process that brings you a better looking, more durable lamp—defect-free!

SUPERIORITY OF FINISH

Our shine outshines them all! The secret's in our newly formulated lacquer that provides the ultimate finish and protects the brass better than anything else on the market. We eliminated ugly black spots that plague brass. We proved our superiority through ultraviolet and aging tests, abrasion tests, tests for resistance to salt and moisture. After putting our lamps through torture tests for everything from staining and pitting to impact resistance, Westwood's outstanding American technology surpassed all competitors tested.

Exhibit A to the Complaint (hereinafter the "Trade Advertisement").

Subsequent advertisements have been placed for publication in two consumer magazines:

Westwood Lamps better than ever with WestPro

A new revolutionary protection system that outperforms the competition, even *Stiffel.*

Our independent testing of competitive lighting products has proven that the Westpro Protection System out performs the competition, including Stiffel. Now when you buy a Westwood lamp, you're selecting "The Proven Best."

A PERFECT BEGINNING is created in the selection and inspection of the base metal, monitored for purity before it is melted and cast into the many outstanding Westwood designs.

OUR SHINE OUTSHINES THEM ALL. To further enhance the beauty of a Westwood lamp, our engineers formulated a new lacquer that protects the brass and provides a flawless finish.

Westwood lamps shine on in every part of the country.

We have weathered the elements in test after test for resistance to salt and moisture, abrasion and even aging. Westwood lamps will outshine them all.

Visit a Westwood dealer near you and see the Westpro Protection System for

In fact, for purposes of the argument, the Westwood claim with regard to the finish of West-

wood products was accepted by the parties as truthful. Transcript at 3.

yourself. We look forward to your appraisal.

Exhibit B to the Complaint (hereinafter the "Consumer Advertisement").

In addition, Stiffel complains of Westwood promotional materials in the form point-of-purchase display units, cards and brochures:

Westwood Lamps better than ever with WestPro

A new revolutionary protection system that outperforms the competition, even *Stiffel.*

Our independent testing of competitive lighting products has proven that the Westpro Protection System out performs the competition, including Stiffel. Now when you buy a Westwood lamp, you're selecting "The Proven Best."

A PERFECT BEGINNING is created in the selection and inspection of the base metal, monitored for purity before it is melted and cast into the many outstanding Westwood designs.

OUR SHINE OUTSHINES THEM ALL. To further enhance the beauty of a Westwood lamp, our engineers formulated a new lacquer that protects the brass and provides a flawless finish.

Westwood lamps shine on in every part of the country.

We have weathered the elements in test after test for resistance to salt and moisture, abrasion and even aging. Westwood lamps will outshine them all.

Visit a Westwood dealer near you and see the Westpro Protection System for yourself. We look forward to your appraisal.

Exhibit C to the Complaint (hereinafter the "Display Unit");

WestPro

The facts about Westwood's exciting new protection system

INDEPENDENT TESTING OF COMPETITIVE LIGHTING PRODUCTS HAS PROVEN THAT THE WESTPRO PROTECTION SYSTEM OUTPERFORMS THE COMPETITION, INCLUDING STIFFEL.

QUALITY CONTROL—From start to finish, Westwood lamps reflect state-of-the-art engineering and superior quality.

THE PURE BASE METAL must pass our exclusive, monitored purity test before it is melted down and cast. SOPHISTICATED EQUIPMENT closely inspects temperature and purity of melt, enabling Westwood to create "the perfect base" for the brass plating. THROUGH A MAJOR BREAKTHROUGH IN CHEMICAL ENGINEERING and a NEW FILTERING SYSTEM we can achieve superior plating solutions and a better, thicker brass plating.

THE END RESULT, a richness to Westwood's workmanship, unlike any you've seen before.

SUPERIORITY OF FINISH—Our shine outshines them all. WESTWOOD's NEWLY FORMULATED LACQUER provides the ultimate finish and protects the brass better than any other product on the market. IN TEST AFTER TEST WESTWOOD's OUTSTANDING AMERICAN TECHNOLOGY SURPASSED ALL COMPETITORS TESTED. We proved our superiority through ultraviolet and aging tests, abrasion tests, tests for resistance to salt and moisture.

WESTWOOD SURPASSED THE COMPETITION in torture tests for everything from staining and pitting to impact resistance.

WESTWOOD's WESTPRO PROTECTION SYSTEM—THERE'S NOTHING LIKE IT! We have reached a new level of achievement, resulting in a flawless lacquer finish that makes Westwood brass lamps better than ever . . . better than the competition.

Exhibit C to the Complaint (hereinafter the "Card");

WESTWOOD LIGHTING

No need to pay more . . . Never settle for less.

From start to finish Westwood lamps reflect quality and value that is better than ever, better than our competition, the best buy in lighting.

A new revolutionary protection system that outperforms the competition.

Independent testing of competitive lighting products has proven that the West-Pro Protection System outperforms the competition, including Stiffel.

It all begins with the selection and inspection of the base metal, which is carefully monitored for purity before it is melted down and cast into one of Westwood's outstanding designs.

Sophisticated equipment that closely inspects temperature and purity of melt, and a new filtering system that gives us plating solutions superior to those used by other manufacturers is the start of the WestPro Protection System. The result is better, thicker brass plating that assures you of a superior product.

To further enhance the beauty and durability of a Westwood lamp, our engineers formulated an entirely new lacquer that protects the lamp and provides an unequaled finish. We have put an end to those ugly black spots that have plagued brass lamps for years. We have weathered the elements in test after test for resistance to salt and moisture, abrasion and even aging.

Westwood's outstanding American technology surpasses all competitors tested. Our WestPro Protection System is superior quality control, superior manufacturing technology, a superior lighting product.

Exhibit C to the Complaint (hereinafter the "Brochure").

Stiffel argues Westwood has repeatedly and falsely represented in the above-quoted advertisements to the trade and consumers and in point-of-purchase literature that "test after test" proves the superiority of Westwood lamps over Stiffel lamps. The genesis of the dispute lies in an effort by the lamp industry to develop a brass plated lamp that would not suffer from problems such as tarnishing, pitting, corrosion or spotting. (See February 6, 1987 Affidavit of L. Keith Niemann, president of Westwood at ¶ 5 (hereinafter "Niemann Affidavit"); February 17, 1987 Affidavit of O. Vincent Scarnicchia, manager of process engineering of Westwood at ¶ 6 (hereinafter "Scarnecchia Affidavit")).

In mid 1985 a competitor of Westwood (and presumably Stiffel) began to advertise a finish for brass plated lamps known as BrassGard. (Nieman Affidavit, ¶ 6; Scarnecchia Affidavit, ¶ 7). Westwood contends BrassGard was tested by it and was found to provide "a *finish* for a brass plated lamp that appeared to be superior to the *finish* on lamps then being manufactured by Westwood and by its competitors including Stiffel." (Niemann Affidavit, ¶¶ 6 and 7; see also Scarnecchia Affidavit, ¶ 7) (emphasis added). As a result of this determination, Westwood began a development program to produce "... a new brass *finish* technology that would be competitive with and, if possible, exceed the benefits of BrassGard while eliminating undesirable aspects of the BrassGard lacquer." (Niemann Affidavit, ¶ 7) (emphasis added).

It was discovered that BrassGard type material was incompatible with Westwood's plating process. In particular, an unidentified film remained on the lamp, the BrassGard finishing material had an unpleasant odor, and an analysis of the components of the BrassGard finishing material showed that toxic compounds were present. This led to an acceleration of [Westwood's] efforts to develop an improved *finishing technology* without toxic components.

(Scarnecchia Affidavit, ¶ 8) (emphasis added).

The Westwood efforts bore fruit and by March 1986 a new process for a brass plated lamp was developed. The new process "begins with a process of monitoring the zinc used for casting the base metal and includes improvements to the plating technology and to the lacquer used to finish the plating process." (*Id.* at ¶ 9).

The Westwood process is known as the WestPro System; Westwood intends to obtain a patent for this process. (*Id.*) The WestPro System represents a "series of new developments that would permit Westwood to provide a thicker, more durable and more environmentally resistant brass

*finish.*" (Niemann Affidavit, ¶ 10) (emphasis added).

After development of the WestPro System, Westwood began to test its lamps using the WestPro System. Westwood was seeking "... to determine if a Westpro plated lamp and, in particular, the *finish* of the plated lamp[,] is better than other known lamp *finishes* ...." (Scarnecchia Affidavit, ¶ 10) (emphasis added). The lamps were subjected to the following in-house tests: "salt spray (also known as salt fog), humidity, tabor abrasive, sand, ultraviolet light and aging, anti-spotting, plating thickness and lacquer thickness." (*Id.*)

Westwood contends the inhouse testing revealed "... the dramatic superiority of the Westpro *finish* over competitive products including, but not limited to, Stiffel." (Niemann Affidavit, ¶ 11) (emphasis added). In addition, independent testing confirmation was sought by Westwood to support its findings. The stated purpose of such independent testing was to obtain "... confirmation of the superiority of the Westpro *finish* over competitive *finishes* ...." (*Id.*) (emphasis added). Westwood asserts the independent tests demonstrate "... the clear superiority shown by the Westpro finish *over the* finish *of the Stiffel lamp and other lamps including those having a BrassGard* finish." (*Id.*, *¶ 12) (emphasis added).*

Armed with the results of both the Westwood inhouse testing and the independent testing, the President and Chief Executive Officer of Westwood prepared advertisements

> to explain to the consumer Westwood's breakthrough in quality *finishing technology* and its superiority to Stiffel's *finishing technology.* ... [T]hese ads were not run until [Westwood's President and CEO] was satisfied that Westwood's tests ... had established the clear superiority of the Westpro *finish* over the Stiffel *finish.*

(*Id.* at ¶ 14; see also ¶ 18) (emphasis added).

Stiffel argues the Westwood advertising is explicit in claiming the WestPro lamp "out-performs the competition including STIFFEL"; that WestPro lamps "have been tested over and over again" and "[t]he proof is here and now" that the WestPro System provides a "more durable lamp"; that Westwood lamps are now "The Proven Best"; and that "test after test" proves the WestPro lamp provides a superior finish and superior overall quality as compared to competitors generally and Stiffel specifically. Stiffel contends the falsity of Westwood's claims is patent from the face of the test materials upon which it relies. It is further alleged that the "test after test" results contained in Westwood's advertising are fictitious and that the tests described in those materials do not support the superiority claims made by Westwood.

Although Stiffel in its submissions and at oral argument drew the court's attention to each aspect of the various Westwood advertisements, the focus of Stiffel's complaint is on the following Westwood statement: "WestPro out-performs the competition including Stiffel." The objections advanced concerning this claim are many. Stiffel contends this Westwood statement is false and disparages its products and trademark. As well, it is contended Westwood did not undertake sufficient testing to form a basis for this claim, as well as many of its other advertising claims. Stiffel argues Westwood tested only the lacquer finish and not other aspects of the Westwood lamps.

The problem thus presented is: what is the WestPro System and what precisely was the subject of the Westwood inhouse and outside independent testing? The parameters of the WestPro System and testing are, however, far from settled. On January 12, 1987, counsel for Westwood in a communication to Stiffel stated: "... Westwood's testing has established that its *finish* is superior to that of its competitors and has written its advertisements to make this point expressly understood by the public." (Affidavit of Robert K. Kretzman, general counsel of Stiffel, letter, dated January 12, 1987, attached) (emphasis added).

The Trade Advertisement leads with the statement: "Westwood out-performs with

WestPro Out-performs the competition including Stiffel." Immediately below this claim it is apparent Westwood's WestPro outperformance claim concerns a "revolutionary breakthrough in quality *finishing* technology [which] has been proven in test after test." (Emphasis added.) Below this statement, three paragraphs of additional information are set forth. The paragraphs are entitled: "Quality Control", "WestPro ... There's Nothing Like It", and "Superiority of Finish". Under the heading "WestPro ... There's Nothing Like It" the copy reads:

... Westwood has reached a new level of achievement. The results are a flawless lacquer *finish* that makes Westwood brass lamps better than ever ... better than the competition. ... The results have been tested over and over again. ... The WestPro System, a process that brings you a better looking, more durable lamp—defect-free!

(Emphasis added.)

The next heading in the advertisement, Superiority of Finish", introduces the following:

Our shine outshines them all! The secret's in our *newly formulated lacquer* that provides the ultimate *finish* and protects the brass better than anything else on the market. ... We proved our superiority through ultraviolet and aging tests, abrasion tests, tests for resistance to sale and moisture. After putting our lamps through torture tests for everything from staining and pitting to impact resistance, Westwood's outstanding American technology surpassed all competitors tested.

(Emphasis added.)

Based upon a review of this advertisement, it is apparent Westwood's WestPro System concerns a "flawless lacquer", a "newly formulated lacquer that provides the ultimate finish" which finish was tested. This is in accord with the January 12, 1987 statement of Westwood's counsel and is consistent with the process Westwood sought to develop. However, counsel for

Westwood contradicted this position during oral argument on February 27, 1987 when he stated:

... I perceived one misimpression [from the court's discussion with counsel to Stiffel], and that is one that [counsel to Stiffel] suggested, namely that the West-Pro System is only a lacquer. That is not the case. The ads don't say that. The technical data that's (sic) submitted, including testing data, talks about plating thickness, it talks about—the ads talk about solutions and plating solutions and taking new zinc and doing all this stuff, and the ads don't read that way, and, furthermore, *the WestPro plating system or I should say finishing system is in fact a plating system that finishes the lamp and is much broader than just mere lacquer.*

(Transcript at p. 49) (emphasis added).

It is clear that if WestPro is defined as it was at oral argument, Westwood has not tested the other components of the system beyond its "newly formulated lacquer." However, if the WestPro definition is limited to the "newly formulated lacquer," it apparently has tested the lacquer. As mentioned, *supra,* the results of such testing are not at issue at this time.

The same comments can be made about the Consumer Advertisements. The notable difference between the Trade and Consumer Advertisements is the use of the phrase "WestPro System" in the Trade Advertisement and the phrase "WestPro Protection System" in the Consumer Advertisement. The Consumer Advertisement, like its Trade counterpart, talks about a *"newly formulated lacquer* that protects the brass and provides a flawless *finish."* (Emphasis added.) This is consistent with the previous definition of Westpro for which the phrase "WestPro Protection System" is more aptly descriptive. To state the obvious, the Consumer Advertisement is at odds with counsel's representation in court of the definition of WestPro.[2]

---

**2.** The Display Unit tracks the language of the Consumer Advertisement and my comments

about the Consumer Advertisement are equally applicable to the Display Unit.

A major shift in the Westwood advertising campaign, however, is observable from a review of the Brochure and the Card. Both the Brochure and the Card use the phrase "WestPro Protection System". However, the copy on each of these documents expands the definition of the WestPro Protection System beyond that set forth in the Trade and Consumer Advertisements. Significantly, the Brochure describes the WestPro Protection System as covering the initial selection and inspection of the base metal, intermediate steps and finally "[t]o further enhance the beauty and durability of the lamp" a "newly formulated lacquer that protects the lamp and provides an unequaled finish" is applied. In conclusion, the Brochure states "Our WestPro Protection System is superior quality control, superior manufacturing technology, a superior lighting product." The Card makes similar points although not in the same form.

A review of the chronology of the development of WestPro and the understanding of it by Westwood's President and Chief Executive Officer and by Westwood's Manager of Process Engineering (the person who developed WestPro) appears to differ from the understanding of Westwood's counsel. Moreover, the advertising itself is not consistent in definition or scope. Additionally, the testing appears to have embraced WestPro as it was understood by Westwood officials and advertised to the trade and consumers.

*Discussion*

To obtain a preliminary injunction Stiffel must demonstrate that "irreparable injury will occur if relief is not granted ... and that there is a reasonable probability of [its] eventual success on the merits." *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980). *Accord, Cerro Metal Products v. Marshall*, 620 F.2d 964, 972–73 (3d Cir.1980); *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131, 1141 (3d Cir.1977); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir.1974).

**A. Likelihood of Success**

Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), prohibits false and misleading advertising in connection with goods or services transported in interstate commerce.[3] *See American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160 (2d Cir.1978); *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir.1954); *Toro Co. v. Textron, Inc.*, 499 F.Supp. 241 (D.Del.1980). The Act applies to false and misleading claims made to the trade as well as to consumers in general.

To carry its burden, Stiffel must show that the Westwood advertising at issue is either false on its face or misleading. As stated by the Second Circuit: "When a merchandising statement or representation is literally or explicitly false, the court may grant relief without reference to the advertisement's impact on the buying public." *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir.1982). Yet when the advertising under attack is not so clearly false, the court's inquiry must focus on the advertisement's tendency to deceive those at whom it was directed: "Whether or not the statements made in the advertisements are literally true, § 43(a) of the Lanham Act encompasses more than blatant falsehoods. It embraces 'innuendo, indirect intimations, and ambiguous suggestions' evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement." *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 277 (2d Cir.1981), *quoting, American Home Products Corp.*, 577 F.2d at 165.

Stiffel need not prove an intent to deceive on the part of Westwood to estab-

---

**3.** Section 43(a), 15 U.S.C. § 1125(a), provides in pertinent part:

Any person who shall affix, apply, or annex, or use in connection with any goods or services ... any false description or representation ... and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

lish a violation of Section 43(a) of the Lanham Act. *See, Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir.1980). However, Stiffel must show the advertising is "likely to influence the purchasing decision." *Skil Corp. v. Rockwell Int'l Corp.*, 375 F.Supp. 777, 783 (N.D.Ill. 1974). Nor must Stiffel prove consumers were in fact deceived or that sales were actually diverted. *See, Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1, 12 (E.D.Pa.1974); *See also John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292, 325 (E.D.Pa.1976), *aff'd and rev'd in part on other grounds, Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3d Cir.1978). As stated by the Third Circuit,

> there seems to be no requirement that purchasers actually be deceived, but only that the false advertisements have a tendency to deceive. This seems to be the result desired by Congress in that Section 43(a) confers a right of action upon any person who "believes that he is or is likely to be damaged" by defendant's practices. While it would be going too far to read the requirement of customer reliance out of this section so far as damages are concerned, we believe that this is a recognition that, as with most equitable relief by way of injunction, Section 43(a) may be asserted upon a showing of likelihood of damage without awaiting the actuality.

*Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 649 (3d Cir.1958). *Accord, Toro Co.*, 499 F.Supp. at 251; *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356 (S.D.N.Y.1976); *Skil Corp.*, 375 F.Supp. at 783.

■ If advertisements are false on their face, a court may find a "tendency to deceive" without looking to evidence of actual consumer response: "If a statement is actually false, relief can be granted on the court's own findings without reference to the reaction of the buyer or the consumer of the product." *American Brands, Inc.*, 413 F.Supp. at 1356. *Accord, American Home Products Corp.*, 577 F.2d at 165;

*Philip Morris, Inc. v. Loew's Theatres, Inc.*, 511 F.Supp. 855, 858 (S.D.N.Y.1980); *Quaker State Oil Refining Corp. v. Burmah-Castrol, Inc.*, 504 F.Supp. 178, 182 (S.D.N.Y.1980).

■ In the case at bar, the testing conducted by and for Westwood apparently concerned Westwood's "newly formulated lacquer." The tests did not address Westwood's selection and inspection of the base metal, the equipment that inspects the temperature and purity of the metal, the filtering system used to obtain a plating solution, the plating solutions, the quality control, the manufacturing technology, or, finally, the total lighting product, all as suggested in the Brochure and the Card. To the contrary, the Westwood testing seems to have been limited to the durability of the newly formulated lacquer, as suggested in the Trade and Commerce Advertisements and in the Display Unit.

I find regardless of whether the WestPro System or WestPro Protection System includes in essence the newly formulated lacquer, as indicated in the Trade and Commerce Advertisements, or includes the actual manufacturing process, as indicated in the Brochure and the Card, the content of the Brochure and the Card, at this point, has been shown to be patently false. This finding is based upon the types of testing conducted by Westwood (essentially concerning the lacquer durability) and the claims of overall manufacturing and lighting product superiority (which go far beyond the durability of the lacquer). *See Johnson & Johnson v. Quality Pure Mfg., Inc.*, 484 F.Supp. 975, 983 (D.N.J.1979) (absence of credible substantiation for an advertising claim is a violation of the Lanham Act and forms a basis for an injunction). Accordingly, I find Stiffel will likely prevail on its Lanham Act claim against Westwood's Brochure and Card advertisements.

The other half of the probability of success question in this case is whether Stiffel has demonstrated it will likely prevail on its claims against Westwood's Trade and Consumer Advertisements.[4] Because

---

4. Because the content of the Display Unit tracks that of the Consumer Advertisement, my assessment of the Consumer Advertisement will encompass the Display Unit.

these advertisements, unlike the Brochure and Card, do not so blatantly proclaim the superiority of Westwood lamps in areas other than those concerning the finish of Westwood's WestPro lamps, I do not find those advertisements to be facially false. Thus, the question must be resolved by reference to representative reactions of the trade and consuming public. *See Vidal Sassoon,* 661 F.2d at 277; *Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209, 1222 (D.Del.1986) ("[w]hen the challenged advertisement is literally true, but creates a deceptive impression about the product, the Court must find that the ad has a tendency to deceive the consumer").

Stiffel has submitted the results of two buyer reaction surveys—one conducted on representatives of the lamp buying trade and the other on representatives of the general consuming public—to demonstrate a significant number of lamp purchasers in the trade and in the general public are and will be deceived by the Westwood Trade and Consumer Advertisements. The studies were conducted by Opinion Research Corporation ("ORC"), alleged to be one of the nation's oldest and most reputable market research organizations. The two studies were overseen by James Heisler, Vice President of ORC, who alleges he has eighteen years of experience in conducting such studies. The first study will be referred to as the "Trade Survey," the second as the "Consumer Survey."

In the Trade Survey, ORC employees conducted fifty face-to-face interviews with individuals responsible for buying lamps for resale at retail furniture and lighting stores, twenty-five in Chicago and twenty-five in Philadelphia. At each interview, an ORC employee asked the lamp buyer to read a copy of the Trade Advertisement, took the advertisement away and asked, "What ideas is this advertisement trying to get across to you about Westwood lamps?" The ORC employee was instructed to probe the buyer with the question, "What else?" until the buyer had nothing else to say. If the buyer failed to mention Stiffel, the interviewer would ask "Does this ad say anything about Stiffel?" and probe until nothing more was divulged. The buyers

were not advised as to who had commissioned the survey.

Heisler collected the results of the survey and analyzed them to determine what impression the Trade Advertisements might convey to the buyers. Heisler found the buyers' responses fell into five distinct categories: (1) comments about the quality or superiority of Westwood's finish/exterior; (2) general comments about the Westwood product without comment about the quality or superiority of the finish or any other characteristic of Westwood lamps; (3) comments about the quality or superiority of the Westwood lamp's finish/exterior and also about the superiority of other characteristics of or the overall superiority of Westwood lamps; (4) no comments about the quality or superiority of the finish/exterior of Westwood lamps but comments about superiority on other characteristics and/or the overall quality of Westwood lamps; and (5) comments about quality or superiority but with the impression the advertisement was for Stiffel. (Heisler Aff., 2/19/87, ¶ 8.) Heisler determined that 34% of the buyers fell into Category 1, 24% fell into Category 2, 24% fell into Category 3, 16% fell into Category 4 and 1% fell into Category 5. Combining Categories 3 and 4, Heisler concluded 40% of the representative buyers "received an impression of Westwood lamps having superior quality or at least superiority beyond just the finish/exterior." (*Id.,* ¶ 9.)

In the Consumer Survey, ORC employees conducted face-to-face interviews with 100 consumers (54 men and 46 women) in shopping malls located in Long Island, New York and in Houston, Texas—fifty in Long Island and fifty in Houston. The ORC interviewer would first determine the shopper was at least eighteen years of age and lived in a household with an income of at least $25,000.00. The consumers were then shown a copy of the Consumer Advertisement and asked the same questions as had been asked the trade buyers. Heisler collected the survey results and determined each consumer's response fell into one of the first four categories identified in the Trade Survey. Apparently no consumers

were confused that the advertisement was for Stiffel lamps. Heisler found 30% of the consumer responses fell into Category 1, 13% fell into Category 2, 35% fell into Category 3, and 22% fell into Category 4. (*Id.*, ¶ 10.) Combining Categories 3 and 4, Heisler concluded "57% of the [consumers tested] received an impression of Westwood lamps having superior overall quality or at least superiority beyond just the finish/exterior." (*Id.*, ¶ 11.) Heisler's affidavit concludes: "Since we employed standard, objective, widely-accepted survey research methods and procedures in conducting these surveys, I am satisfied that the results are accurate and reliable evidence of the message received by substantial numbers of the readers of these advertisements." (*Id.*, ¶ 12.)

Westwood has submitted an affidavit of Michael A. Rappeport, President of the market and survey research firm R.L. Associates, to attack the ORC surveys. Rappeport suggests the pools of buyers and consumers interviewed by ORC were not truly representative of the groups targeted by the Westwood advertisements and that the ORC results are thus not "statistically projectable." Rappeport's assertion is based on the fact the ORC interviewers were not identified as "past or present actual buyers and/or those expecting to be in the market for lamps within some specified time in the future" or as readers of the publications in which the advertisements are to appear, and also because more than half of the consumers interviewed were men, whereas women are more likely to buy lamps and read the magazines in question. (Rappeport Aff., 2/23/87, ¶ 4.)

Beyond what he terms this "quick and dirty methodology," Rappeport questions Heisler's inclusion of the responses falling into Category 3 in drawing the conclusion that consumers and buyers perceived the advertisements as proclaiming more than simply superiority of finish. Rappeport suggests that the responses Heisler collected into Category 3—those in which interviewees indicated the advertisement's message included claims of both superiority of Westwood finish and superiority of the overall product—must be interpreted to mean each interviewee read the advertisement to claim a superior overall product *because of* a superior finishing technology. Rappeport suggests this interpretation embodies "the entire point of all advertising: to take a specific benefit of a product and communicate through that a general claim to superiority." (*Id.*, ¶ 7.) Based on Rappeport's observations, Westwood appears to claim that, even assuming the ORC surveys were fairly representative, only 16% of the trade buyers and 22% of consumer purchasers have exhibited a tendency to be misled by the Westwood advertisements.

In addition, Westwood asks the court to recognize a converse conclusion from the surveys—namely, that a majority of those surveyed correctly interpreted the Westwood advertisements as making a superiority claim based upon the superior finish of the Westwood lamps. Westwood points out that 34% of the trade buyers and 30% of the consumers surveyed interpreted the advertisements as only asserting a superior Westwood finish. Combining these percentages with those from Category 3—in which Westwood asserts the interviewees interpreted a Westwood claim of overall superiority because of a superior finish—Westwood argues 58% of trade buyers and 65% of consumers surveyed correctly interpreted the Westwood advertisements.

Having reviewed the Heisler affidavit and the survey results attached thereto, I am not sufficiently persuaded by Rappeport's attacks to discredit the ORC surveys. Although the pools of people surveyed by ORC may not be as representative as Westwood claims they should be, it does not seem the pools are so unrepresentative that the survey results are likely to be misleading. Westwood has demonstrated no basis for its suggestion that because the interviewees were not identified as prospective lamp buyers and were not identified as readers of the magazines in which the advertisements circulate, their perceptions of the advertisements' messages should be disfavored. Nor am I convinced the buyer and consumer responses falling into Heisler's Category 3 should be inter-

preted as Rappeport urges. A typical Category 3 trade buyer response to the Trade Advertisement was: "Better quality lamp. Better finish, better manufacturing.... It outshines them all including Stiffel. Meaning they have a better finish. That's all." (Heisler Aff., 2/19/87, Ex. E–3, Respondent 22.) A typical Category 3 consumer response to the Consumer Advertisement was: "They are better than Stiffel. Something about the polished brass." (*Id.*, Ex. F–3, Respondent 59.) Having sifted through the Category 3 responses, an objective observer can say no more than these interviewees may have interpreted the advertisements as asserting general claims of overall Westwood superiority or they may have interpreted them as asserting claims of overall Westwood superiority based upon a superior finish.

A review of cases similar to this one reveals "[t]here is no established quantitative measure of the degree to which an advertisement must mislead or deceive, for a plaintiff to prevail under the Lanham Act." *R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.,* 511 F.Supp. 867, 876 (S.D.N.Y.1980). Rather, the courts confronted with these types of problems have wrestled with applying to the challenged advertising the standard enunciated in *McNeilab, Inc. v. American Home Products, Corp.,* 501 F.Supp. 517, 528 (S.D.N.Y. 1980) (emphasis in original): "[A] qualitative rather than a quantitative determination is enough to support a conclusion that an advertisement *"tends"* to mislead, if the qualitative showing establishes that a not insubstantial number of consumers re-

ceive a false or misleading impression from it." In *McNeilab,* the court found consumer surveys directed toward the challenged advertising suggesting "deception rates" of 23% and 39.5% to constitute sufficient evidence supporting the issuance of a preliminary injunction against the challenged advertising. In *R.J. Reynolds Tobacco,* the court found a consumer survey "deception rate" of between 20% and 33% sufficient to warrant preliminary injunctive relief against the advertising. 511 F.Supp. at 876.[5]

■ The Trade Survey which has been submitted by Stiffel indicates that somewhere between 16% and 40% of the trade buyers will be misled by Westwood's Trade Advertisement into believing Westwood offers a lamp which, in terms of overall quality, has been proven to be superior to its competition. Similarly, the Consumer Survey submitted by Stiffel suggests between 22% and 57% of the consuming public will be victims of the same misconception. Because these figures lead me to conclude a "not insubstantial" number of the people to whom these advertisements are directed will tend to be deceived or misled by the challenged advertisements, I find Stiffel has demonstrated a reasonable likelihood of eventual success in this litigation.

Westwood also argues Stiffel has failed to satisfy the elements of the case law that require the specific message to be identified as a condition precedent to establishing a claim of false advertising. *See Plough, Inc. v. Johnson & Johnson Baby*

---

**5.** Conclusions about consumer deception in other comparable cases tend to be so fact-specific to those cases that they are of little aid in the case at bar. In *Upjohn Co. v. American Home Products Corp.,* 598 F.Supp. 550 (S.D.N.Y.1984), for example, different portions of the challenged advertising misled 33% and 76% of consumers surveyed and an injunction issued. In *U–Haul Int'l, Inc. v. Jartran, Inc.,* 522 F.Supp. 1238 (D.Ariz.1981), *aff'd in part, rev'd in part on other grounds,* 793 F.2d 1034 (9th Cir.1986), different aspects of the challenged advertising were shown to mislead between 20% and 76% of those surveyed and the preliminary injunction issued.

Stiffel's assertion that *Coca-Cola Co. v. Tropicana Products, Inc.,* 538 F.Supp. 1091 (S.D.N.Y.

1982), as reversed in 690 F.2d 312 (2d Cir.1982), stands for the proposition that a 15% "deception rate" constitutes a sufficient showing to support injunctive relief against challenged advertising is inaccurate. In that case, the Second Circuit reversed the district court's denial of a motion for a preliminary injunction, finding the challenged advertising false on its face. Thus, the Second Circuit did not refer to the consumer survey to determine whether the challenged advertising had a tendency to mislead its target audience. Rather, the Second Circuit used the consumer survey results to determine the existence of irreparable harm in that the survey indicated there were "at least a small number of *clearly* deceived" consumers. 690 F.2d at 316 (emphasis in original).

*Products, Co.,* 532 F.Supp. 714, 717 (D.Del. 1982). As previously indicated, since the Westwood testing is conceded *arguendo* to be accurate, to the extent the specific message in Westwood's advertisements is a better finish, Westwood has demonstrated the truth of this claim. The problem results from the additional message contained in Westwood advertising which suggests more than a better finish. This message is the "overall superiority" of Westwood lamps over the competition, including Stiffel, based upon non-existent testing results.

In defense of its advertising, Westwood argues the overall message is a comparative claim of general superiority and is thus permissible puffing. Additionally, Westwood asserts advertising inherently involves claims of superiority. Westwood contends "it is only when a specific attribute of a product is singled out to the consumer that the courts will require substantiation of the claim." (Westwood's Surreply Memorandum, at 2.) Stiffel counters that the Westwood advertisements go far beyond mere puffery.

 Generally, advertising the advantages of a product, including claims of general superiority, constitutes puffing and is not actionable as false advertising. *See Testing Systems, Inc. v. Magnaflux Corp.,* 251 F.Supp. 286, 288 (E.D.Pa.1966). However, misdescriptions of specific or absolute characteristics of a product are actionable. *See Smith-Victor Corp. v. Sylvania Electric Products, Inc.,* 242 F.Supp. 302, 308–09 (N.D.Ill.1965); *Toro Co.,* 499 F.Supp. at 253 n. 23. *See also Jartran,* 522 F.Supp. at 1253 ("advertising statements placed in an ad knowing or intending that they are of the type that will affect the consumer's judgment, are not puffery, but rather constitutes actionable representations within the meaning of the Lanham Act"). Westwood's claims to superiority, flowing as they do from purported independent tests, do more than simply allege general superiority. Accordingly, I find them not protected as mere puffery.

**B.** *Irreparable Harm*

 A February 9, 1987 affidavit from Leo LeClair, President and Chief Executive Officer of Stiffel, describes Stiffel's asserted risk of damage if an injunction is not granted. "As these [false] superiority claims will be disseminated to the consuming public very shortly (if that has not already occurred), many trade accounts are likely to determine that they no longer need or want Stiffel lamps in their stock since Westwood lamps are cheaper or, at a minimum, they may shift a significant proportion of their lamp purchases from Stiffel to Westwood." (LeClair Affidavit, ¶ 3.) LeClair contends Stiffel is also threatened by the use of the Display, Brochure and Card which contain Westwood advertising previously described. (*Id.* at ¶ 4.) Stiffel contends "the entire trade has now been led to believe that the WestPro lamp 'outperforms the competition including STIFFEL' and that Westwood possesses 'test after test' that 'proves' the superiority of its lamp over Stiffel lamps." (Stiffel's Brief in Support of Injunctive Relief at p. 14.) "These untruths, if not promptly stopped by court order, will quickly spread to and throughout the consuming public and cause irremediable damage to [Stiffel's] business, reputation and good will." (LeClair Affidavit, ¶ 5.)

The Second Circuit has held that the moving party carries its burden of demonstrating irreparable harm when it offers "proof providing a reasonable basis for the belief that ... [it] is likely to be damaged as a result of the false advertising." *Vidal Sassoon,* 661 F.2d at 278, *quoting, Carter-Wallace, Inc.,* 631 F.2d at 190. The court noted:

> Sassoon and [defendant's] Body on Tap compete in the same market, and it is quite likely that the apparently effective suggestions of competitive superiority, if repeatedly communicated to consumers, would eventually result in loss of sales to Sassoon.... Although Sassoon offered no evidence of actual sales loss directly traceable to the alleged misrepresentations, proof of diversion of sales is not

required for an injunction to issue pursuant to § 43(a) [of the Lanham Act].

*Id.* at 278 (citations omitted).

Westwood has already published and disseminated false, deceptive and misleading advertisements to the trade and to consumers. Accordingly, injunctive relief is justified to prevent the continuation of such an advertising program. Giving due consideration to Westwood and the public interest, *Continental Group, Inc.*, 614 F.2d at 357, the grant of a preliminary injunction is appropriate, in light of the publication and dissemination of the Trade and Consumer Advertisement and point-of-purchase materials. Westwood is engaged in false advertising as reflected in the Brochure and the Card, and in deceptive or misleading advertising as reflected in the Trade and Consumer Advertisements. Because the public, as well as competitors, are to be protected from false, deceptive and misleading advertising, injunctive relief is appropriate. *See Philip Morris, Inc.*, 511 F.Supp. at 858; *see also, Estate of Presley v. Russen*, 513 F.Supp. 1339, 1377 (D.N.J.1981).

*Conclusion*

For the reasons stated, a preliminary injunction will issue to prevent the advertising found to be objectionable in this opinion. Counsel for Stiffel are to prepare an appropriate form of injunction consistent with this opinion.