**SYNCSORT INCORPORATED,**
Plaintiff,

v.

**SEQUENTIAL SOFTWARE,**
**INC., Defendant.**

**No. CIV. A. 98–882(AJL).**

United States District Court,
D. New Jersey.

Jan. 28, 1999.

320

Ronald Abramson, Hughes Hubbard & Reed LLP, Saddle River, Jeff H. Galloway, Hughes, Hubbard & Reed LLP, New York, City, counsel for Syncsort Incorporated.

Michael S. Stein, Pashman Stein, P.C., Hackensack, John M. DiMatteo, Karla G. Sanchez, Patterson, Belknap, Webb & Tyler LLP, New York City, counsel for Sequential Software, Inc.

## OPINION

LECHNER, District Judge.

This is an action commenced by plaintiff and counterclaim defendant Syncsort Incorporated ("Syncsort") against defendant and counterclaim plaintiff Sequential Software, Inc. ("Sequential"). In a complaint (the "Complaint"), filed by Syncsort on 26 February 1998, Syncsort seeks injunctive relief and compensatory and punitive damages for alleged misappropriation of trade secrets, false advertising, breach of con-

tract, copyright infringement and unfair competition. *See* Complaint. Jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), 15 U.S.C. § 1121 and 28 U.S.C. § 1367. *See id.* at ¶ 2.

On 8 April 1998, Sequential filed an answer to the Complaint (the "Answer"). *See* Answer. At that time, Sequential also alleged counterclaims for antitrust violations (the "Antitrust Counterclaim") and false advertising (the "False Advertising Counterclaim")(collectively, the "Counterclaims"). *See* Counterclaims. Jurisdiction over the Counterclaims is asserted under Fed.R.Civ.P. 13, 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1367. *See id.* at ¶ 68.

Currently before the court is the motion (the "Motion") by Syncsort for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) ("Rule 12(c)"). Alternatively, Syncsort moves, pursuant to Fed.R.Civ.P. 42(b) ("Rule 42(b)"), for severance of the Counterclaims and a stay of discovery as to the counterclaims.[1] For the reasons set forth below, the Motion is granted in part, and denied in part.[2]

*Facts* [3]

### A. Background

Syncsort is a large international corporation which has its principal place of business in New Jersey. *See* Complaint at ¶¶ 1, 3. It researches, develops and sells computer sorting programs for corporate data processing customers. *See id.* at ¶ 3. Syncsort is a leading company in the market for computer sorting software. *See* Counterclaims at ¶¶ 73, 75; Complaint at ¶ 3. It developed and released to the public a computer sorting product known as "SyncSort/UNIX." [4] *See* Complaint at ¶ 3.

Sequential is a two-person software company also existing under the laws of New Jersey; it researches, develops and sells competing computer sorting programs. *See id.* at ¶ 4; Answer and Counterclaims at ¶¶ 4, 69, 73. Sequential re-

---

1. In support of the Motion, Syncsort submitted: Notice of Motion to Dismiss all Counterclaims or, in the Alternative, for Severance of Counterclaims and Stay of Discovery; Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings or, in the Alternative, for Severance of Counterclaims and Stay of Discovery (the "Moving Brief"); Declaration of Ronald Abramson on behalf of Syncsort Incorporated, attaching Exhibits 1—4 (the "Abramson Declaration"); Plaintiff's Reply Memorandum of Law in Further Support of Motion for Judgment on the Pleadings or, in the Alternative, for Severance of Counterclaims and Stay of Discovery (the "Reply Brief").

 In opposition to the Motion, Sequential submitted: Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings (the "Opposition Brief").

2. Sequential never moved to amend the Answer and Counterclaims. *See* Fed.R.Civ.P. 15(a). Nor did Sequential request leave to amend the Answer and Counterclaims in the Opposition Brief.

3. As discussed below in more detail, *see infra* at 9 to 15, when considering a motion for judgment on the pleadings, all factual inferences must be drawn in favor of the non-movant. *See Turbe v. Virgin Islands*, 938 F.2d 427, 428 (3d Cir.1991)(citing *Unger v. National*

*al Residents Matching Program*, 928 F.2d 1392, 1394–95 (3d Cir.1991)); *see also Dykes v. Southeastern Penn. Transp. Auth.*, 68 F.3d 1564, 1565 n. 1 (3d Cir.), *cert. denied*, 517 U.S. 1142, 116 S.Ct. 1434, 134 L.Ed.2d 556 (1996); *Piecknick v. Pennsylvania*, 36 F.3d 1250, 1255 (3d Cir.1994). Rule 12 standards are not altered where a movant seeks dismissal of a counterclaim—all allegations of the counterclaim also are accepted as true and are accorded the benefit of all reasonable inferences. *See Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Cold Metal Process Co. v. United Eng'g & Foundry Co.*, 190 F.2d 217, 220 (3d Cir.1951); *Centennial School Dist. v. Indep. Blue Cross*, 885 F.Supp. 683, 686 (E.D.Pa.1994)(citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1410 (3d Cir.), *cert. denied*, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991)). To the extent possible, therefore, the facts are derived from the Answer and Counterclaims. Where Sequential is unaware of or does not dispute certain other facts not found in its pleading, such facts are derived from the Complaint.

4. When referring to the product of Syncsort, "SyncSort/UNIX" and "SyncSort" are used interchangeably.

cently released for sale a new computer sorting product called "PdqSort." *See* Answer and Counterclaims at ¶¶ 13, 14, 70.

According to Syncsort, the advanced sorting and operational algorithms and optimization for the various computer platforms for which Syncsort sorting packages are offered (collectively, the "Information") are trade secrets, except insofar as they are covered by issued patents. *See* Complaint at ¶ 5. To ensure confidentiality of the Information, Syncsort requires customers seeking to license or evaluate its sorting products to sign a licensing agreement (the "Licensing Agreement") and a non-disclosure agreement (the "Non–Disclosure Agreement"). The Licensing Agreement and the Non–Disclosure Agreement contain "strict requirements ... includ[ing] prohibitions against unauthorized disclosure, strict limitations on who may use Syncsort's software, express prohibitions against reverse engineering, and prohibitions against dissemination of any benchmark or test results." *Id.* at ¶ 7.

Sometime during the period from 1994 through 1997, Sequential sought to obtain trial copies of the sorting products of Syncsort, including SyncSort/UNIX. *See id.* at ¶ 8; Answer at ¶ 8. Syncsort advised Sequential that in order to · obtain such copies, Sequential would be required to sign the Licensing Agreement. *See* Complaint at ¶ 8; Answer at ¶ 8. In light of the restrictions in the Licensing Agreement, Sequential declined the trial copies. *See* Complaint at ¶ 8; Answer at ¶ 8. Sequential then received an unsolicited copy of SyncSort/UNIX but did not sign or otherwise agree to sign the Licensing Agreement. *See* Answer at ¶ 9. Sequential alleged it received the copy of SyncSort/UNIX from Syncsort. *Id.*

Sequential denied that upon receiving a copy of SyncSort/UNIX, it reverse engineered or ran benchmark tests on SyncSort/UNIX in order to investigate its methods of operation. *See* Answer at ¶¶ 10, 11; Complaint at ¶¶ 10, 11. Sequential admitted only that it "ran SyncSort/UNIX." Answer at ¶ 12. Sequential

instead contended it had completed the development of the core sorting algorithms and operations used in PdqSort before obtaining a copy of SyncSort/UNIX. *See id.* at ¶ 13. In fact, Sequential contended it "has been designing and refining PdqSort since 1993." *Id.* at ¶ 70. Sequential further contended it developed the user interface of PdqSort without copying any part of SyncSort/UNIX. *Id.* at ¶ 14.

Sequential launched PdqSort in February 1998. *See id.* at ¶ 70. Also in February 1998, Sequential advertised PdqSort on a site on the Internet (the "Sequential Web Site"). *See* Complaint at ¶ 16; Opposition Brief at 2. The Sequential Web Site contained benchmark results demonstrating that PdqSort was twice as fast as SyncSort/UNIX. *See* Opposition Brief at 2; Complaint at ¶ 16.

Syncsort also maintains a web site on the Internet (the "Syncsort Web Site"), accessible to consumers throughout the United States. *See* False Advertising Counterclaim at ¶ 85. In an advertisement on the Syncsort Web Site (the "Syncsort Web Site Advertisement") concerning SyncSort/UNIX, Syncsort stated:

'SyncSort is the fastest commercial sort product in the world. SyncSort provides unmatched sort performance on UNIX systems. It's been proven time and time again in benchmark tests ... [SyncSort made] a new world record.'

*Id.* at ¶ 86 (quoting Syncsort Web Site Advertisement, attached as Exhibit A to Answer and Counterclaims).

Sequential alleged Syncsort recently introduced another sorting software product compatible with Windows NT(R) operating systems that competes with an existing product of Sequential. *See id.* at ¶ 78. Syncsort, in an advertisement published in ENT Magazine on 18 March 1998 (the "Syncsort Magazine Advertisement"), stated: " 'Now the world's fastest sort technology has the friendly face of Windows NT.' " *Id.* at ¶ 88 (quoting Syncsort Magazine Advertisement, attached as Exhibit B to Answer and Counterclaims). Addition-

ally, in a recent mass mailing (the "Syncsort Mailing Advertisement"), Syncsort stated that it combines the " 'world's fastest sort technology' " with a new Windows program. *Id.* at ¶ 90 (quoting Syncsort Mailing Advertisement, attached as Exhibit C to Answer and Counterclaims). " 'Benchmark tests ... rigorously test SyncSort's design to ensure that it is the fastest and most efficient sort product on every platform.' " *Id.*

Sequential alleged Syncsort controls the computer sorting market despite the fact that SyncSort is not the fastest sort product. *See id.* at ¶ 75–76. Sequential also alleged the advertisements (collectively, the "Syncsort Advertisements") professing SyncSort/UNIX to be the fastest sort product are false, deceptive and misleading. *See id.* at ¶¶ 91–94.

### B. *Procedural History*

As mentioned, Syncsort filed the Complaint on 26 February 1998. *See* Complaint. On 3 April 1998, pursuant to a scheduling conference and accompanying order (the "3 April 1998 Order"), the time in which Sequential was permitted to answer the Complaint was extended to 8 April 1998. *See* 3 April 1998 Order. Sequential filed the Answer and Counterclaims on 8 April 1998. *See* Answer and Counterclaims. Syncsort filed a reply to the Counterclaims (the "Reply to Counterclaims") on 29 April 1998. *See* Reply to Counterclaims.

### Discussion

### A. *Standard For Dismissal Under Rule 12(c)*

A defendant may move to dismiss a complaint or parts of a complaint before or after filing an answer. *See* Fed.R.Civ.P. 12(b)(6) and (c). A motion made before an

answer is filed is a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"). A motion made after an answer is filed is a motion for judgment on the pleadings pursuant to Rule 12(c).[5] "A defense of failure to state a claim upon which relief can be granted ... may be made in ... [a] motion for judgment on the pleadings." *See* Fed.R.Civ.P. 12(h)(2). In the instant action, the Motion was filed after the Answer and Counterclaims and is based on the argument that the Antitrust Counterclaim and the False Advertising Counterclaim fail to state a claim upon which relief can be granted.

■ A Rule 12(c) motion for judgment on the pleadings is treated like a motion to dismiss under Rule 12(b)(6). *See* Fed. R.Civ.P. 12(h)(2); *see also Turbe,* 938 F.2d at 428; *Institute for Scientific Information, Inc. v. Gordon & Breach, Science Pubs. Inc.,* 931 F.2d 1002, 1006 (3d Cir.), *cert. denied,* 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991); *Britamco Underwriters, Inc. v. C.J.H., Inc.,* 845 F.Supp. 1090, 1092 (E.D.Pa.), *aff'd,* 37 F.3d 1485 (3d Cir.1994); *Southmark Prime Plus, L.P. v. Falzone,* 776 F.Supp. 888, 891 (D.Del.1991).

■ Like Rule 12(b)(6), Rule 12(c) requires the Court "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff. [The motion can be granted] only if no relief could be granted under any set of facts that could be proved." *Turbe,* 938 F.2d at 428 (citing *Unger,* 928 F.2d at 1394–95); *see also Dykes,* 68 F.3d at 1565 n. 1; *Piecknick,* 36 F.3d at 1255; *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994).

---

5. Rule 12(c) provides:
 Motion for Judgment on the Pleadings. After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56.
 Fed.R.Civ.P. 12(c).

A complaint may be dismissed for failure to state a claim where it appears beyond any doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811–12, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Piecknick,* 36 F.3d at 1255; *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988); *Angelastro v. Prudential–Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

■ A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom,* 848 F.2d at 401. Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"); *Haase v. Webster,* 807 F.2d 208, 215 (D.C.Cir.), *vacated on other grounds,* 835 F.2d 902 (D.C.Cir.1987); *Briscoe v. La-Hue,* 663 F.2d 713, 723 (7th Cir.), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt,* 643 F.2d 618, 626 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Bermingham v. Sony Corp. of Am.,* 820 F.Supp. 834, 846 (D.N.J.), *aff'd,* 37 F.3d 1485 (3d Cir.1994).

■ A district court reviewing the sufficiency of a complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his [or her] claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Bermingham,* 820 F.Supp. at 846.

Generally, when conducting such an inquiry, material beyond the pleadings should not be considered. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997); *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Wallace v. Systems & Computer Tech. Corp.,* No. 95–6303, 1997 WL 602808, at *5 (E.D.Pa.23 Sept.1997); *Gannon v. Continental Ins. Co.,* 920 F.Supp. 566, 574 (D.N.J.1996).

■ If the claims are based upon undisputably authentic documents expressly relied upon or integral to the pleadings or matters of public record, however, such documents may be considered. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426; *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 707 (3d Cir.1996); *In re Donald Trump Sec. Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *EP Medsystems, Inc. v. Echocath, Inc.,* 30 F.Supp.2d 726, 740 (D.N.J.1998); *Pension Benefit Guar. Corp.,* 998 F.2d at 1196; *Wallace,* 1997 WL 602808, at *5; *Interfaith Community Organization v. Alliedsignal, Inc.,* 928 F.Supp. 1339, 1345 (D.N.J.1996); *Weiner v. Quaker Oats,* 928 F.Supp. 1372 (D.N.J.1996), *rev'd on other grounds,* 129 F.3d 310 (3d Cir.1997); *Gannon,* 920 F.Supp. at 574. Documents attached to a motion to dismiss must be explicitly relied upon or integral to the complaint or counterclaim of the nonmovant. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426 (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996)).

■ The failure of a nonmovant to attach or cite documents in the complaint or counterclaim does not preclude a review of the texts of such extrinsic documents in conjunction with a motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.,*

114 F.3d at 1426; *EP Medsystems*, 30 F.Supp.2d at 740. The reason for this rule is to prevent

> [t]he situation in which a [claimant] is able to maintain a claim ... by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not [actionable].

*Id.; see Dykes*, 68 F.3d at 1567 n. 3 (if documents specifically referred to in the pleadings could not be considered, "a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied"). Under these circumstances, where a motion to dismiss references such documents outside of the complaint or counterclaim, the motion to dismiss is not converted into a motion for summary judgment. *See id.; Pension Benefit Guar. Corp.*, 998 F.2d at 1196–97.

In support of the instant Motion, Syncsort submitted and relied upon, among other things, the Syncsort Advertisements, the Licensing Agreement, the Non–Disclosure Agreement and the Responses of Sequential to the First Set of Interrogatories, dated 26 May 1998, (the "Sequential Interrogatories Responses").[6] *See* Moving Brief at 7–8. Syncsort contended the Syncsort Advertisements, the Licensing Agreement and the Sequential Interrogatories Responses may all properly be considered in ruling on the instant Motion. *See id.*

Consideration of the Syncsort Advertisements, the Licensing Agreement and the Non–Disclosure Agreement does not require conversion of the instant Motion into one for summary judgment under Fed. R.Civ.P. 56. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

These documents were expressly referenced and relied upon in the Answer and Counterclaim. *See* Answer and Counterclaims at ¶¶ 8, 9, 77, 85–94. The Licensing Agreement, the Non–Disclosure Agreement and the Syncsort Advertisements, moreover, are integral both to the False Advertising Counterclaim and the Antitrust Counterclaim.

The Sequential Interrogatories Responses, by contrast, were neither relied upon by Sequential, nor are they integral to the pleadings of Sequential. Rather, the Sequential Interrogatories Responses were relied upon by Syncsort "to the extent they help explain the theories underlying each counterclaim." *See* Moving Brief at 7. As such, the Sequential Interrogatories Responses will not be considered in connection with the instant Motion. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

**B.** *The Antitrust Counterclaim*

In the Antitrust Counterclaim, Sequential alleged Syncsort violated section two ("Section Two") of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 2. Specifically, Sequential alleged, *inter alia*,

> Syncsort is able to control the UNIX sorting market [7] and maintain control of that market through a variety of means including the use of improperly restrictive licensing and confidentiality agreements, misuse of its copyright, bringing anti-competitive litigation, and knowingly asserting claims for invalid or unfounded trade secrets.

Antitrust Counterclaim at ¶ 77. Sequential further alleged:

> Sequential also markets a computer sorting software product compatible with Windows NT(R) operating systems.

---

**6.** The Sequential Interrogatories Responses, the Licensing Agreement and the Non–Disclosure Agreement are annexed to the Abramson Declaration as Exhibits 2, 3 and 4, respectively.

**7.** Sequential defined the "UNIX sorting market" to include "the national market for computer sorting software for UNIX operating systems." *See* Antitrust Counterclaim at ¶ 73. Sequential alleged both SyncSort/UNIX and PdqSort are compatible with UNIX computer based systems. *Id.* at ¶ 74.

Recently, Syncsort introduced a product into the Windows NT(R) operating systems market that competes with Sequential's product .... Upon information and belief, Syncsort is improperly using its current position in the UNIX sorting market to improperly monopolize the newly forming Windows NT(R) market .... Through its use of those tactics, Syncsort intends to monopolize and maintain its monopoly of the UNIX Sorting Market.

*Id.* at ¶¶ 78–80.

■ To state a claim for monopolization under Section Two of the Sherman Act,[8] a plaintiff must plead facts indicating " '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.,* 113 F.3d 405, 412–13 (3d Cir.)(quoting *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 197 (3d Cir.), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993)), *cert. denied,* —— U.S. ——; 118 S.Ct. 435, 139 L.Ed.2d 335 (1997); *see United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Hudson's Bay Co. Fur Sales Inc. v. Am. Legend Coop.,* 651 F.Supp. 819, 845 (D.N.J.1986).

■ To state a claim for attempted monopolization under Section Two of the Sherman Act, a plaintiff must plead facts sufficient to show Syncsort " '(1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power.' " *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 442 (3d Cir.)(quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)), *reh'g denied,* 129 F.3d 724 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1385, 140 L.Ed.2d 645 (1998); *see Schuylkill Energy Resources,* 113 F.3d at 413; *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 750 (3d Cir.1996); *Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1197 (3d Cir.1995); *Barr Labs., Inc. v. Abbott Labs.,* 978 F.2d 98, 112 (3d Cir. 1992).

■ In determining whether there exists a viable claim of monopolization or attempted monopolization, an inquiry "into the relevant product and geographic market" is required. *Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. 884; *see Schuylkill Energy Resources,* 113 F.3d at 415; *Ideal Dairy Farms,* 90 F.3d at 750; *Pastore v. Bell Telephone Co. of Pennsylvania,* 24 F.3d 508, 512 (3d Cir.1994); *Hudson's Bay Co.,* 651 F.Supp. at 835. An antitrust plaintiff must plead facts sufficient to demonstrate a viable relevant market. *See Queen City Pizza,* 124 F.3d at 436; *Schuylkill Energy Resources,* 113 F.3d at 415; *Brader v. Allegheny General Hospital,* 64 F.3d 869, 877 (3d Cir.1995).

---

**8.** Section Two of the Sherman Act provides, in relevant part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ....

15 U.S.C. § 2. The Antitrust Counterclaim did not allege a violation of Section One of the Sherman Act, a precondition of which requires "a 'contract, combination ... or conspiracy' between *separate* entities. [Section One] does not reach conduct that is 'wholly unilateral.' " *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)(emphasis in original)(quoting *Albrecht v. Herald Co.,* 390 U.S. 145, 149, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) and citing *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)); *see Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Fisher v. City of Berkeley, California,* 475 U.S. 260, 266, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986), *reh'g denied,* 475 U.S. 1150, 106 S.Ct. 1806, 90 L.Ed.2d 350 (1986).

In the antitrust context, the standard for dismissal under Rule 12 is rigorous; antitrust claims are construed liberally. *See McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Hospital Bldg. Co. v. Trustees,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Knuth v. Erie–Crawford Dairy Coop. Ass'n,* 395 F.2d 420, 423 (3d Cir.), *cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973); *Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.,* 129 F.3d 240, 243 (2d Cir. 1997). Where the specific facts and details are "largely in the hands of the alleged [monopolists]," *see Poller,* 368 U.S. at 473, 82 S.Ct. 486, dismissals should be granted "very sparingly." *See Hospital Building Co.,* 425 U.S. at 746, 96 S.Ct. 1848.

Facts must be pleaded with reasonable particularity, however, in order to permit an inference that a Federal antitrust claim is cognizable. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)("*Associated General*")(in an antitrust case, "a district court must retain the power to insist upon some specificity in the pleading before allowing a potentially massive factual controversy to proceed"); *Commonwealth of Pennsylvania ex. rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 179 (3d Cir.1988)(quoting *Associated General,* 459 U.S. at 526 n. 11, 103 S.Ct. 897)(" 'It is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.' "); *see also Electronics Communications Corp.,* 129 F.3d at 243; *Garshman v. Universal Resources Holding, Inc.,* 641 F.Supp. 1359, 1367 (D.N.J.)(quoting *Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 654 (7th Cir.1984)), *aff'd,* 824 F.2d 223 (3d Cir.1987).

"[A] litigant must adumbrate in each counterclaim an intelligible definition of the elements of its antitrust claim, even under the liberal notice pleading requirements of the Federal Rules of Civil Procedure." *CCPI Inc. v. American Premier, Inc.,* 967 F.Supp. 813, 819 (D.Del.1997). Factual specificity in antitrust complaints is required.

'When the requisite elements [of an antitrust claim] are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.'

*PepsiCo,* 836 F.2d at 182 (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)).

As discussed, bare legal conclusions will not survive a motion to dismiss. *See Schuylkill Energy Resources,* 113 F.3d at 417 (in dismissing antitrust claim under Section 2 of the Sherman Act, court stated "[w]e are not ... required to accept as true unsupported conclusions and unwarranted inferences"); *PepsiCo,* 836 F.2d at 179 ("[T]he court must review the allegations of fact contained in the [antitrust] complaint; for this purpose the court does not consider conclusory recitations of law."); *Garshman,* 641 F.Supp. at 1367 ("[C]onclusory allegations which merely recite the litany of antitrust will not suffice.") A claimant alleging Federal antitrust violations must plead facts with sufficient particularity to avoid dismissal under to Rule 12(c). *See Schuylkill Energy Resources,* 113 F.3d at 413; *Garshman,* 641 F.Supp. at 1367.

The factual specificity required for antitrust claims stems in part from the fact that the antitrust laws were designed for the "protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct.

690, 50 L.Ed.2d 701 (1977); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 518 (3d Cir.1998)(quoting *Queen City Pizza,* 124 F.3d at 441)(" 'The purpose of the Sherman Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.' "); *Alberta Gas Chemicals Ltd. v. E.I. DuPont De Nemours & Co.,* 826 F.2d 1235, 1239 (3d Cir.)("Conduct that harms competitors may benefit consumers—a result the antitrust laws were not intended to penalize."), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988); *Hudson's Bay Co.,* 651 F.Supp. at 834 ("[C]ourts ... will not permit [the Sherman Act's] salutary purpose to be invoked by business concerns seeking protection from the 'rigors of competition.' ") (citations omitted).

In this connection, the Supreme Court explained:

> [P]laintiffs ... must prove more than injury casually linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. 690; *see Schuylkill Energy Resources,* 113 F.3d at 413; *Brader,* 64 F.3d at 875.

Applying these principles to the Counterclaims, the issue in the instant Motion is whether the Counterclaims sufficiently alleged a violation of Section Two of the Sherman Act, 15 U.S.C. § 2, to entitle Sequential to offer evidence in support of the Antitrust Counterclaim.

### 1. *Allegations of Monopolization*

#### a. *Monopoly Power*

■ As discussed, under a claim for monopolization, Sequential must have pleaded facts sufficient to show, *inter alia,* how Syncsort willfully acquired or maintained monopoly power to exclude competitors from the relevant market. *See Schuylkill Energy Resources,* 113 F.3d at 415; *see also American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Garshman,* 824 F.2d at 229; *Hudson's Bay Co.,* 651 F.Supp. at 844. A claim for attempted monopolization, however, does not require Sequential to have pleaded actual possession of monopoly power. *See Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. 884; *Rolite, Inc. v. Wheelabrator Environmental Sys., Inc.,* 958 F.Supp. 992, 1001 (E.D.Pa.1997). An attempted monopolization claim nevertheless requires Sequential to have pleaded Syncsort has a dangerous probability of achieving monopoly power in the relevant market. *See Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. 884.

■ Monopoly or market power has been defined as the power to control prices or exclude competition in the relevant market. *See Grinnell,* 384 U.S. at 571, 86 S.Ct. 1698; *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)("*du Pont*"); *Hudson's Bay Co.,* 651 F.Supp. at 844. Market power may be inferred from a predominant share of the market. *See id.; du Pont,* 351 U.S. at 391, 76 S.Ct. 994; *Fineman,* 980 F.2d at 201.

Market share is not always a surrogate for monopoly power, however. Monopoly power may also exist when an entity does not have a majority of the market share. *See United States v. Columbia Steel Co.,* 334 U.S. 495, 527–28, 68 S.Ct. 1107, 92 L.Ed. 1533, *reh'g denied,* 334 U.S. 862, 68 S.Ct. 1525, 92 L.Ed. 1781 (1948). While market share may be the "most significant" factor in assessing monopoly power, *see Pastore,* 24 F.3d at 513, this Circuit has stated:

> [A]lthough the size of a defendant's market share is a significant determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive. Other factors to be considered include the strength of competition, probable de-

velopment of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand.

*Barr Lab.*, 978 F.2d at 112; *see Pastore,* 24 F.3d at 513; *Fineman,* 980 F.2d at 201 (quoting *Weiss v. York Hospital*, 745 F.2d 786, 827 n. 72 (3d Cir.), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985))(other relevant factors to be considered include freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods or services from outside the market, and consumer demand).

▇ Here, Sequential recited in conclusory fashion that Syncsort "controls the majority of the UNIX sorting market." *See* Antitrust Counterclaim at ¶ 76. This vague allegation of "control" is the closest Sequential comes to alleging market share. In support of its single allegation, Sequential argued, "[c]ommanding a high price for an inferior product is inexplicable except for one's monopoly control over the market." Opposition Brief at 10. This feeble explanation in the Opposition Brief does not render the conclusory recitation of market dominance in the Antitrust Counterclaim sufficient under Rule 12(c). *See PepsiCo*, 836 F.2d at 179 ("It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint.").[9]

Accepting as true all factual allegations contained in the Answer and Counterclaims, this single statement of market power in the pleadings of Sequential is an insufficient allegation of the possession of monopoly power, or even of the dangerous probability of achieving monopoly power.

Sequential, moreover, failed to plead the existence of any other factors sufficient to support a finding that Syncsort possesses monopoly power or the dangerous probability of achieving such power. The allegations comprising the Antitrust Counterclaim did not address pricing trends and practices in the industry, the ability of consumers to substitute comparable goods or services from outside the market or consumer demand. *See* Antitrust Counterclaim; *see also Barr Lab.*, 978 F.2d at 112; *Fineman*, 980 F.2d at 201. In the Opposition Brief, Sequential stated:

> [O]ther than Syncsort and IBM, other competitors in the computer sort field are extremely small with limited means to compete. Further, Syncsort's significant market share has allowed it to create an industry standard command structure for using computer sort programs on UNIX operating systems.

Opposition Brief at 10. Even if true, these conclusory assertions of monopoly power not set forth in the Antitrust Counterclaim also do not suffice under Rule 12(c).

### b. *Relevant Market*

▇ A review of the Antitrust Counterclaim also reveals Sequential failed to properly define the relevant market. Viability of claims of monopolization and attempted monopolization under Section Two of the Sherman Act are dependent upon demonstration by a plaintiff why a proposed market is the relevant market. *See Schuylkill Energy Resources*, 113 F.3d at

---

9. In *Pepsico*, this Circuit held that an amended complaint of the plaintiff, the Commonwealth of Pennsylvania, merely recited a "bare-bones assertion" that there had been a horizontal conspiracy by a soft drink syrup manufacturer and bottlers in violation of Section One of the Sherman Act. *See PepsiCo*, 836 F.2d at 181. Because the amended complaint "did not come close to adequately pleading conduct amounting to any of these per se offenses [under the Sherman Act]," the court affirmed the dismissal of the district court for failure to state a claim. *See id.* at 183, 184. In so holding, the court looked only to the averments in the pleadings; "the legal theories set forth in ... [the] brief are helpful only to the extent that they find support in the allegations set forth in the complaint." *Id.* at 181; *see also id.* (quoting *Car Carriers, Inc.*, 745 F.2d at 1107)(" '[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.' "). Although the court in *Pepsico* construed the pleadings in the context of the Soft Drink Interbrand Competition Act of 1980, 15 U.S.C. §§ 3501–3503, the rationale extends to the instant action.

415 (citing *Spectrum Sports,* 506 U.S. at 456–59, 113 S.Ct. 884). A relevant market is comprised of a relevant product market and a relevant geographic market, see *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Hudson's Bay Co.,* 651 F.Supp. at 834, both of which must be defined in the pleadings.[10]

 Sequential bears the burden of defining the relevant market. *See Brokerage Concepts,* 140 F.3d at 513; *Queen City Pizza,* 124 F.3d at 436; *Pastore,* 24 F.3d at 512; *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 726 (3d Cir.), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992); *Hudson's Bay Co.,* 651 F.Supp. at 835. Sequential alleged:

> Both PdqSort and SyncSort/UNIX compete in the national market for computer sorting software for UNIX operating systems (the "UNIX sorting market") .... [The UNIX sorting market] consists of primarily three competitors: Syncsort, Innovative Routines International, Inc. and IBM.

Antitrust Counterclaim at ¶¶ 73, 75. As discussed below, it appears the proposed definition of Sequential, which restricts the product market to three competitors and one operating system, is impermissibly narrow.

The failure to plead a relevant product market is, standing alone, a sufficient basis for dismissal of an antitrust claim. *See Queen City Pizza,* 124 F.3d at 436; *TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1025 (10th Cir.), *cert. denied,* 506 U.S. 999, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992); *Hudson's Bay Co.,* 651 F.Supp. at 837 (citing *Neumann v. Reinforced Earth Co.,* 786 F.2d 424, 428–30 (D.C.Cir.), *cert. denied,* 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986)).

This Circuit has stated:

> 'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it ....' Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Queen City Pizza,* 124 F.3d at 436 (quoting *Brown Shoe Co.,* 370 U.S. at 325, 82 S.Ct. 1502).[11]

---

10. The relevant geographic market is the appropriate "section of the country" within which the impact of an alleged anticompetitive activity is measured. *Brown Shoe Co.,* 370 U.S. at 336, 82 S.Ct. 1502. In determining the suitability of a definition of the relevant geographic market, "commercial realities" such as the location of customers and the available sources of supply must be considered. *See id.* An antitrust plaintiff must define the relevant geographic area by "careful selection of the market area in which the seller operates, and to which the purchaser can practically turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). The relevant geographic market may be local, regional, national or international in origin. *See Brown Shoe Co.,* 370 U.S. at 337, 82 S.Ct. 1502; *see, e.g., Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (national); *Times–Picayune Pub. Co. v. United States,* 345

U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)(regional); *Hudson's Bay Co.,* 651 F.Supp. at 845 (worldwide).

Sequential alleged the relevant geographic market is a "national market[.]" *See* Antitrust Counterclaim at ¶ 73. As discussed below, in light of the failure of Sequential to properly plead a relevant product market, it is unnecessary to determine whether Sequential sufficiently alleged a relevant geographic market.

11. " 'Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively.' " *Queen City Pizza,* 124 F.3d at 437 (quoting *Allen–Myland, Inc. v. Int'l Business Machines Corp.,* 33 F.3d 194, 206 (3d Cir.), *cert. denied,* 513 U.S. 1066, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994)). In assessing interchangeability,

In *Queen City Pizza*, this Circuit affirmed the dismissal of antitrust claims of pizza franchisee plaintiffs against a national franchiser, Domino's Pizza, Inc. ("Domino's"), for the failure to plead a relevant market. The complaint of the franchisees alleged, among other things, Domino's monopolized and attempted to monopolize the market in pizza supplies and ingredients for use in Domino's stores, in violation of Section Two of the Sherman Act. The complaint defined the relevant market as including Domino's-approved ingredients, supplies, materials and distribution services used by Domino's Pizza franchisees. The court rejected the proposed definition because the franchisees failed to include in the definition all products which are reasonably interchangeable or explain the rationale underlying such a narrow definition. The court observed:

> Here, the dough, tomato sauce, and paper cups that meet Domino's ... standards and are used by Domino's stores are interchangeable with dough, sauce and cups available from other suppliers and used by other pizza companies. Indeed, it is the availability of interchangeable ingredients of comparable quality from other suppliers, at lower cost, that motivates this lawsuit. Thus, the relevant market, which is defined to include all reasonably interchangeable products, cannot be restricted solely to those products currently approved by Domino's ... for use by Domino's franchisees. For that reason, we must reject plaintiffs' proposed relevant market.

*Queen City Pizza*, 124 F.3d at 438.

Similarly, in the instant action, the definition of the relevant market was limited to the products of three competitors—

Syncsort, Innovative Routines International, Inc. and IBM. *See* Antitrust Counterclaim at ¶ 75. Sequential omitted mention of any potential entrants into the market. *See SmithKline Corp.*, 575 F.2d at 1063 (market definition must take into account "all relevant sources of supply" including "potential entrants to the market"). Sequential also failed to mention other products available from other suppliers which are comparable to or substitutable for the product of Syncsort, from the point of view of consumers. *See Queen City Pizza*, 124 F.3d at 438 n. 6. For example, it appears Sequential excluded programs which perform sorting operations under the UNIX operating system, including Ahlsort, Aps Sort, Nsort, NitroSort and OT Sort. *See* Reply Brief at 7.

More importantly, Sequential did not explain its rationale for ignoring other existing or potential sources of supply in favor of a more restrictive definition. Significantly, Sequential did not state in its pleadings the sorting product of Syncsort is unique and cannot be interchanged with other sorting products. *See Queen City Pizza*, 124 F.3d at 436; *Re–Alco Indus. Inc. v. Nat'l Center for Health Educ. Inc.*, 812 F.Supp. 387 (S.D.N.Y.1993)(dismissal where plaintiff failed to allege specific health education product was unique or explain why product was not part of the larger market for health education materials).

The proposed market definition, moreover, encompassed only the "UNIX sorting market," a narrow cross-section of a larger market. Consequently, the definition inexplicably ignored the broader sorting market comprised of all programs which per-

---

factors such as "price, use and qualities" may be considered. *Id.* (quoting *Tunis Brothers Co.*, 952 F.2d at 722); *see du Pont*, 351 U.S. at 391, 76 S.Ct. 994; *Fineman*, 980 F.2d at 198; *Hudson's Bay Co.*, 651 F.Supp. at 835. "A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).

Cross-elasticity is evidence of interchangeability; "[c]ross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers." *Queen City Pizza*, 124 F.3d at 438 n. 6 (internal quotations omitted); *see Brokerage Concepts*, 140 F.3d at 513–14; *Hudson's Bay Co.*, 651 F.Supp. at 835–36.

form sorting operations or operations equivalent to sorting outside of the UNIX operating system. Sequential did not allege in its pleadings that UNIX is the only operating system in existence. Sequential also did not allege in its pleadings that other operating systems in existence are not comparable or equivalent to the UNIX operating system. In fact, Sequential expressly acknowledged the existence of other potentially comparable operating systems. For example, Sequential alleged, "Syncsort introduced a product into the Windows NT(R) operating systems market that competes with Sequential's product." Antitrust Counterclaim at ¶ 78. It also appears the Syncsort Magazine Advertisement, attached to the pleadings of Sequential, compares the sorting technology employed by Syncsort with the Windows NT systems sort. *See* Syncsort Magazine Advertisement.

As discussed, a relevant market includes all products which are reasonably interchangeable. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Brown Shoe Co.*, 370 U.S. at 325, 82 S.Ct. 1502; *Queen City Pizza*, 124 F.3d at 437. The failure of Sequential to define the market in terms of reasonable interchangeability or explain the rationale underlying its narrow proposed market definition is, in itself, grounds for dismissal. *See Queen City Pizza*, 124 F.3d at 437. The argument offered by Sequential in the Opposition Brief that "the market is clearly segregated by operating systems," *see* Opposition Brief at 7–8, does not remedy the deficiencies of the allegations in the Antitrust Counterclaim. *See id.* at 436 (requiring adequate market be defined or explained in the pleading); *see also PepsiCo*, 836 F.2d at 181 (theories set forth in opposition brief are not a substitute for specificity of allegations in antitrust complaint).

#### c. *Intent to Exclude*

Sequential, moreover, did not plead any facts evidencing the willful acquisition or maintenance of monopoly power necessary for a monopolization claim, or a specific intent to exclude competitors required for an attempted monopolization claim. *See Spectrum Sports*, 506 U.S. at 456, 113 S.Ct. 884; *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

"Th[e] [Supreme Court] and other courts have been careful to avoid constructions of § 2 [of the Sherman Act] which might chill competition, rather than foster it." *Spectrum Sports*, 506 U.S. at 458, 113 S.Ct. 884. To establish the requisite intent under Section Two, an antitrust plaintiff must plead, much more prove, "something more than an intent to compete vigorously[.]" *Id.* at 459, 113 S.Ct. 884; *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985)(describing intentional monopolization as the predatory exclusion of "rivals on some basis other than efficiency"). The intent element of a Section Two claim is met if monopoly power is deliberately used "'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak Co.*, 504 U.S. at 482–83, 112 S.Ct. 2072 (quoting *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948)).

The paragraph in the Antitrust Counterclaim ostensibly addressing the willful maintenance and control of market power is merely a litany of subsidiary allegations of anticompetitive litigation, improper licensing and copyright misuse. *See* Antitrust Counterclaim at ¶ 77 ("Syncsort is able to control the UNIX sorting market and maintain control of that market through a variety of means including the use of improperly restrictive licensing and confidentiality agreements, misuse of its copyright, bringing anticompetitive litigation, and knowingly asserting claims for invalid or unfounded trade secrets.").

Construing the subsidiary allegations of the Antitrust Counterclaim in the light most favorable to Sequential, the Antitrust Counterclaim is devoid of factual allega-

tions demonstrating a willful maintenance of monopoly power or a specific intent to exclude competition. Each of these subsidiary allegations is addressed seriatim.

### (1) *Anticompetitive Litigation*

Without offering examples, Sequential broadly alleged Syncsort maintained control of the market through the "bringing [of] anti-competitive litigation." *See* Answer and Counterclaim at ¶ 77.

■ It appears the prosecution of the instant lawsuit by Syncsort is, however, immunized from antitrust liability. Persons who associate together to petition the government for redress are generally immune from antitrust liability. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, *reh'g denied*, 365 U.S. 875, 81 S.Ct. 899, 5 L.Ed.2d 864 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)(the "Noerr–Pennington doctrine"). The Noerr–Pennington doctrine has been extended to petitions to the courts for redress. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).[12]

Where the complaint is nothing more than a "sham," however, the petitioner is not entitled to antitrust immunity. *See id.* at 512, 92 S.Ct. 609. The "sham" exception to the Noerr–Pennington doctrine has been defined as follows:

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor,' through the 'use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (citations omitted).

Sequential argued Syncsort, in filing the Complaint, used baseless litigation to maintain its monopoly share and "to put a small but serious start up competitor out of business with full knowledge that it had no legitimate trade secret claim." Opposition Brief at 16.

■ Irrespective of whether Syncsort ultimately prevails in the instant action, it appears there was a basis to initiate the proceedings. *See id.* at 62, 113 S.Ct. 1920; *FilmTec Corp.*, 67 F.3d at 937. Sequential

---

**12.** *California Motor Transport Co.* involved an action by one group of trucking companies (the plaintiffs) against another (the defendants) for treble damages and injunctive relief under the Clayton Act, 15 U.S.C. § 15. The plaintiffs alleged the defendants conspired to institute state and federal proceedings to defeat applications by the plaintiffs to acquire or transfer operating rights. The Supreme Court stated, *inter alia*, the defendants had the right to join together to petition the judicial branch of government. The Court held:

[T]he right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition. We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of . . . courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors.

404 U.S. at 510–11.

Petitions to the court for redress, which may enjoy antitrust immunity, include litigation brought by a single litigant. *See FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 937 (D.C.Cir.)(extending Noerr–Pennington Doctrine to single litigant), *cert. denied*, 519 U.S. 814, 117 S.Ct. 62, 136 L.Ed.2d 24 (1996).

did not plead facts revealing Syncsort acted with an improper or malicious purpose in filing the Complaint. Sequential also did not plead any facts indicating Syncsort used the instant lawsuit as an "anticompetitive weapon" against Sequential. *See Professional Real Estate Investors,* 508 U.S. at 61, 113 S.Ct. 1920; *see also In re Warfarin Sodium Antitrust Litig.,* No. 98–1232, 1998 WL 883469, at *7 (D.Del. 7 Dec. 1998)(granting motion to dismiss where antitrust plaintiff merely alleged "conclusory allegations that defendant's petition lacked evidentiary support [and] ... offer[ed] no basis for its assertion that defendant initiated [its petition to the court] without any 'realistic expectation of success on the merits' ").

Additionally, "even [an antitrust] plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and subjective components of a sham must still prove a substantive antitrust violation." *Id.* at 61, 113 S.Ct. 1920. As previously discussed, Sequential did not plead the essential elements of an antitrust claim.

### (2) *Copyright Misuse*

Sequential also alleged Syncsort maintained control of the UNIX sorting market through the "misuse of copyright." Antitrust Counterclaim at ¶ 77. The Antitrust Counterclaim does not contain any allegations explaining how Syncsort misused its copyright. *See id.*

▆▆▆ The mere acquisition of intellectual property rights is, in itself, insufficient to give rise to antitrust liability. *See Walker Process Equip., Inc.,* 382 U.S. at 177, 86 S.Ct. 347 (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945))(" 'A patent, by its very nature is affected with a

public interest . . . . [It] is an exception to the general rule against monopolies and to the right to access to a free and open market.' "); *C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1368 (Fed.Cir.)("It is not presumed that the patent-based right to exclude necessarily establishes market power in antitrust terms."), *reh'g denied,* 161 F.3d 1380 (1998); *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.,* 497 F.2d 285, 291 (10th Cir.)("[A] good faith effort to enforce one's copyright is not the type of exclusionary conduct condemned by [Section] 2 of the Sherman Act."), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975); *see also Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059 (Fed.Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1367 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *Discovision Assocs. v. Disc Mfg., Inc.,* No. 95–21, 1997 WL 309499, at *7–8 (D.Del. 3 Apr. 1997); *Rolite, Inc.,* 958 F.Supp. at 1001 n. 2; *cf. Eastman Kodak Co.,* 504 U.S. at 479–480 n. 29, 112 S.Ct. 2072 (quoting *Times–Picayune Pub. Co.,* 345 U.S. at 611, 73 S.Ct. 872)("The Court has held many times that power gained through some natural or legal advantage such as a patent [or] copyright ... can give rise to [antitrust] liability *if 'a seller exploits his [or her] dominant position in one market to expand his [or her] empire into the next.' ")(Emphasis added).

In the Opposition Brief, Sequential attempted to explain its conclusory allegation of copyright misuse. Sequential argued certain provisions of the Licensing Agreement which preclude competitors from ever challenging the intellectual property rights of Syncsort violate the antitrust laws. *See* Opposition Brief at 12.[13] Sequential further argued copyright mis-

---

13. The Licensing Agreement states, in pertinent part:

 CONFIDENTIALITY.

 LICENSEE agrees that the PRODUCT(s), together with any other data and materials supplied by [Syncsort] to LICENSEE ... (a) are the property of [Syncsort] and re-

main so even after delivery to LICENSEE; (b) contain confidential information and proprietary trade secrets of [Syncsort], protected by law, and of substantial value to [Syncsort]; and (c) are protected by the Copyright Laws and, if applicable, the Patent Laws of the United States.

use is a valid independent basis for the Antitrust Counterclaim. *See* Opposition Brief at 13–14 (citing *Lasercomb Am. v. Reynolds,* 911 F.2d 970, 976–77 (4th Cir. 1990)).

In *Lasercomb,* a software program developer (the "developer") brought an action for copyright infringement and fraud against a steel rule die manufacturer (the "manufacturer"). As a defense, the manufacturer contended anticompetitive language in the standard licensing agreement of the developer amounted to misuse of copyright. *Lasercomb,* 911 F.2d at 972. Specifically, the manufacturer contended the licensing agreement was an attempt to use the copyright to control competition by forbidding all licensees from developing or assisting in the development of any kind of computer-assisted die-making software. *Id.*

Upon reviewing the development of copyright and patent law, the Fourth Circuit held copyright misuse is a valid defense to copyright infringement. *See Lasercomb,* 911 F.2d at 976. The court, however, refrained from construing copyright misuse as a *per se* violation of antitrust law:

> So while it is true that the attempted use of a copyright to violate antitrust law probably would give rise to a misuse of copyright defense, the converse is not necessarily true—a misuse need not be a violation of antitrust law in order to comprise an equitable defense to an infringement action.

*Id.* at 978.

This Circuit has yet to address the viability of copyright misuse as a legal basis

> LICENSEE agrees not to disclose, transfer or other wise make available the PRODUCTS(s) [sic], or any PRODUCT related information (including but not limited to flow charts, diagnostic information, test results, screen images, printed output, product manuals, etc.) to any person other than employees of the Licensee who have a need to have such knowledge for the normal commercial use of the PRODUCT(s).
>
> LICENSEE agrees not to cause or permit the reverse engineering, reverse assembly or reverse competition of the PRODUCT(s).

of an antitrust claim. Whether this Circuit recognizes copyright misuse as an independent antitrust violation is irrelevant to the disposition of the Motion, however, because Sequential did not allege facts evidencing copyright misuse, much more an antitrust violation. Significantly, the relevant provisions of the Licensing Agreement differ in substance and effect from those found in *Lasercomb.*

In *Lasercomb,* the licensing provisions at issue precluded *any and all* competition with the licensor for a period of ninety-nine years. *See Lasercomb,* 911 F.2d at 972–73. The court observed the offending licensing agreement clauses "prevent[ed] the licensee from participating *in any manner* in the ['writing, development, production or sale']" of computer-assisted die-making software." *Id.* (quoting standard licensing agreement)(emphasis added). The Fourth Circuit further observed:

> The language employed in the [developer's] agreement is extremely broad. Each time [the developer] sells its ... program to a company and obtains that company's agreement to the noncompete language, the company is required to forego utilization of the creative abilities of all its officers, directors and employees in the area of ... die-making software. Of yet greater concern, these creative abilities are withdrawn from the public.

*Id.* at 978.

In the instant case, by contrast, the Licensing Agreement states, in relevant part:

> LICENSEE agrees not to use, or allow any third party to use, the PRODUCTS(s) or any PRODUCT related information to aid in the development and/or marketing of a product competitive with the PRODUCT(s).
>
> LICENSEE agrees not to challenge [Syncsort's] right in and to the PRODUCT(s) and related data and materials, including, but not limited to, the copyrights and/or patents in it. The provisions of this section survive the termination of this LICENSE.

Licensing Agreement at ¶ 11.

LICENSEE agrees not to cause or permit the reverse engineering, reverse assembly of reverse competition of the PRODUCT(s) [of Syncsort]. LICENSEE agrees not to use, or allow any third party to use, the PRODUCTS(s) [sic] or any PRODUCT related information to *aid* in the development and/or marketing of a product competitive with the PRODUCT(s).

Licensing Agreement at ¶ 11 (emphasis added). These provisions of the Licensing Agreement restrict licensees from making use of the intellectual property of Sync-Sort/UNIX to compete with Syncsort; the provisions do not, however, prohibit independent development of a product to compete with Syncsort. *Compare* Licensing Agreement at ¶ 11 *with Lasercomb,* 911 F.2d at 979 (regarding the latter, "[t]he misuse arises from [the developer's] attempt to use its copyright in a particular expression, the Interact software, to control competition in an area outside the copyright, i.e., the idea of computer-assisted die manufacture, regardless of whether such conduct amounts to an antitrust violation"). Significantly, Sequential did not allege, nor does it appear, the Licensing Agreement prohibits Sequential from developing its own computer sorting program.

It appears from the Licensing Agreement, moreover, that Syncsort is not using its copyright to control competition. It appears instead Syncsort is attempting to protect what it asserts are trade secrets. The Licensing Agreement provides:

> LICENSEE agrees that the PRODUCT(s), together with any other data and materials supplied by [Syncsort] to LICENSEE ... (a) are the property of [Syncsort] and remain so even after delivery to LICENSEE; (b) contain confidential information and proprietary trade secrets of [Syncsort], protected by law, and of substantial value to [Syncsort],; and (c) are protected by the Copyright Laws and, if applicable, the Patent Laws of the United States.

Licensing Agreement at ¶ 11.

Sequential argued the data Syncsort seeks to protect through its Licensing Agreement are not trade secrets. *See* Opposition Brief at 14–15. Regardless of whether the Information is subject to trade secret protection, the fact remains Sequential did not plead any facts indicating Syncsort is using its copyrights to control competition. *See Lasercomb,* 911 F.2d at 978–79 (misuse of copyright defense predicated upon licensor's use of copyright to control competition). It appears the language in the Licensing Agreement serves to protect any trade secret rights of Syncsort, not to curb competition. Accordingly, the conclusory allegation of copyright misuse is inadequate demonstration of an antitrust violation.

(3) *Licensing and Non–Disclosure Agreements*

Sequential relatedly asserted Syncsort "use[s] improperly restrictive licensing and confidentiality agreements." Antitrust Counterclaim at ¶ 77. Sequential failed to plead facts sufficient to support such an allegation, however. Significantly, Sequential did not enter into any agreements with Syncsort. The Licensing Agreement and the Non–Disclosure Agreements attached to the submissions of Sequential remain unsigned. Sequential conceded it "did not sign or otherwise agree to sign a licensing agreement ...." *See* Answer at ¶ 9. As discussed below, potential customers of Syncsort who do not wish to be bound by the Non–Disclosure and Licensing Agreements need not license its products.

This Circuit has recognized objections to licensing restrictions are founded predominately on principles of contract, not antitrust. In *Queen City Pizza,* the court observed that where a franchise agreement existed between parties, plaintiffs alleging antitrust violations were forced to purchase products from the defendant not

because of the market power of the defendant, but because they were bound to do so by contract. The court stated:

> Plaintiffs need not have become [the defendant's] franchisees. If the contractual restrictions in ... the general franchise agreement were viewed as overly burdensome or risky at the time they were proposed, plaintiffs could have ... made some alternative investment. They chose not to do so .... [P]laintiffs must purchase products from [the defendant] not because of [the defendant's] market power over a unique product, but because they are bound by contract to do so. If [the defendant] acted unreasonably when, under the franchise agreement, it restricted plaintiffs' ability to purchase supplies from other sources, plaintiffs' remedy, if any, is in contract, not under the antitrust laws.

*Queen City Pizza*, 124 F.3d at 441; *see Associated General*, 459 U.S. at 538–40, 103 S.Ct. 897 (focusing on the nature of the injury alleged to determine whether it is of the type the antitrust laws were designed to protect); *Schuylkill Energy Resources*, 113 F.3d at 415–16 (where antitrust plaintiff was prohibited from competing with defendant pursuant to written agreement, alleged injury is not "of the type the antitrust laws were intended to prevent"); *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 94–95 (3d Cir.)(alleged injury must be proximately caused by antitrust violation to justify treble damages recovery), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986).

█ Any injury resulting from alleged restrictions in the Licensing and Non–Disclosure Agreements is contractual in na-

ture. The restrictions embodied in the Licensing Agreement pertain only to those potential competitors who sign the agreement. *See, e.g.,* Non–Disclosure Agreement ("Th[e] test and evaluation [of the product(s) of Syncsort] does not obligate The CUSTOMER to purchase/implement the PRODUCT(s).")It appears the economic freedom of signatories to the Licensing Agreement and the Non–Disclosure Agreement is restricted by the terms of the agreement, not by monopoly power of Syncsort.[14] The remedy of signatories to restrictive licensing agreements, if any, is found in the laws of contract, not antitrust. *See Queen City Pizza*, 124 F.3d at 441.[15]

### 2. *Allegation of Leveraging*

Also included in the Antitrust Claim is what appears to be an independent claim of leveraging under Section 2 of the Sherman Act. In this regard, Sequential alleged:

> Sequential also markets a computer sorting software product compatible with Windows NT(R) operating systems. Recently, Syncsort introduced a product into the Windows NT(R) operating systems market that competes with Sequential's product. Upon information and belief, Syncsort is improperly using its current position in the UNIX sorting market to improperly monopolize the newly forming Windows NT(R) market.

Antitrust Counterclaim at ¶¶ 78–79.

█ A leveraging theory under Section Two of the Sherman Act is premised upon the utilization of market dominance in the primary market to gain a monopoly, or a dangerous probability of a monopoly, in

---

14. Had Sequential pleaded the sorting product of Syncsort is unique and not interchangeable, however, the contractual restraints in the Licensing Agreement and Non–Disclosure Agreement may be considered the equivalent of monopoly power. *See Queen City Pizza*, 124 F.3d at 439 (citing and distinguishing *Eastman Kodak Co.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265); *Pepsico, Inc. v. Coca–Cola Co.*, No. 98–CV–3282, 1998 WL

547088, at * 10–11 (S.D.N.Y.27 Aug.1998) (where defendant provides "exclusive" service, economic forces, not contractual restraints, dictate the boundaries of the market).

15. Sequential, however, signed neither the Licensing Agreement nor the Non–Disclosure Agreement. It appears Sequential may lack standing to pursue a contractual remedy against Syncsort.

the secondary, or "leveraged" market. *See Fineman*, 980 F.2d at 198 (citing *Lorain*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162); *see also Griffith*, 334 U.S. at 108, 68 S.Ct. 941; *Advo*, 51 F.3d at 1202–03; *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 953 F.Supp. 617, 652 (E.D.Pa. 1997).

Preliminarily, "[i]f there is no monopoly power [in the primary market], there can be no illegal leveraging of the [secondary] market." *Delaware Health Care Inc. v. MCD Holding Co.*, 957 F.Supp. 535, 540 (D.Del.)(citing *Fineman*, 980 F.2d at 198), *aff'd*, 141 F.3d 1153 (3d Cir.1998). As discussed, Sequential has failed to allege with appropriate factual specificity monopoly power in the primary, so-called UNIX sorting market. The leveraging claim of Sequential may be dismissed strictly on this ground. Assuming, *arguendo*, Sequential pleaded facts indicating Syncsort possessed monopoly power in a properly defined primary market, it nevertheless appears Sequential did not plead illegal leveraging of the secondary market.

■■■■ To avoid dismissal of a monopoly leveraging claim, a plaintiff must plead facts which, if proven, would demonstrate a "threatened or actual monopoly in the leveraged market." *Fineman*, 980 F.2d at 206; *Rolite, Inc.*, 958 F.Supp. at 1003. The Sherman Act does not "proscribe anticompetitive unilateral conduct that falls shy of threatened monopolization." *Fineman*, 980 F.2d at 205. Allegations evidencing only that a defendant enjoys a "competitive advantage" in the leveraged market will not suffice. *Id.* at 206; *see Advo*, 51 F.3d at 1202–03 (allegations of antitrust leveraging "have come under increasing attack as economically groundless .... [Such arguments] imply that a monopolist somehow magically can multiply monopoly power in one market into monopoly power in two markets. This makes no sense").

In expounding upon its leveraging claim, Sequential argued:

> [T]he only two competitors in the Widows NT sorting market are Syncsort

and Sequential. As alleged, Syncsort is using its improper monopoly power in the UNIX market, along with this baseless action against Sequential, to unfairly compete in the Windows NT market. Opposition Brief at 17. These arguments fall short of demonstrating Syncsort possesses threatened or monopoly power in the Windows NT market. As discussed, the instant lawsuit is immunized by the Noerr–Pennington doctrine. *See Professional Real Estate Investors*, 508 U.S. at 61, 113 S.Ct. 1920. Sequential also has not otherwise properly pleaded the elements of a monopolization or attempted monopolization claim in the proposed primary market (the UNIX sorting market).

■■■ With respect to the secondary market, the fact that Syncsort may enjoy a competitive advantage in the proposed secondary market (the Windows NT market) is, as mentioned, insufficient to sustain a monopoly leveraging claim. Sequential merely alleged "Syncsort introduced a product into the Windows NT(R) operating systems market that competes with Sequential's product." Antitrust Counterclaim at ¶ 78. Sequential nowhere alleged, much more supported with appropriate factual assertions, Syncsort threatened customers in the Windows NT(R) market to conduct business with them, or granted discounts to persuade customers to purchase the product of Syncsort over those of Sequential. *See* Antitrust Counterclaim; *see also Advo*, 51 F.3d at 1203 (absent such conduct, actions of company with monopoly power did not amount to unlawful leveraging). Allegations that Syncsort "suppressed or reduced competition" in the leveraged market "are the type of conclusory allegations ... that are insufficient even at the pleading stage." *Rolite, Inc.*, 958 F.Supp. at 1003; *see Fineman*, 980 F.2d at 206.

Even if Syncsort is the only competitor of Sequential in the Windows NT market, it appears the actions of Syncsort do not offend antitrust principles. As this Circuit has observed, claims of leveraging often

are attacked as "economically groundless" because "[t]he shape of the demand curve constrains the behavior of all sellers, even monopolists." *Advo*, 51 F.3d at 1203. Where a monopolist charges monopoly prices in the leveraged market, such conduct "merely will lead to a wave of new entrants who will drive prices down to competitive levels." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).[16] Notably, Sequential did not plead the existence of any barriers to entry in the secondary market. *See Fineman*, 980 F.2d at 204 ("[E]ven if [the antitrust defendant] remains the only supplier in the relevant [secondary] market, the record clearly proves the barriers to entry in the [secondary] market are extremely low."). Consequently, Sequential has not properly pleaded the existence of unlawful leveraging of monopoly power.

It appears no relief under Section Two of the Sherman Act could be granted under any set of facts which could be proved consistent with the allegations and subsidiary allegations in the Antitrust Counterclaim. *See Hartford Fire Ins.*, 509 U.S. at 811–12, 113 S.Ct. 2891; *Hishon*, 467 U.S. at 73, 104 S.Ct. 2229; *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99; *Piecknick*, 36 F.3d at

1255; *ALA*, 29 F.3d at 859; *Jordan*, 20 F.3d at 1261; *Unger*, 928 F.2d at 1395; *Markowitz*, 906 F.2d at 103; *Ransom*, 848 F.2d at 401; *Angelastro*, 764 F.2d at 944. When a plaintiff fails to allege essential elements of an antitrust claim, the complaint should be dismissed. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, because the Antitrust Counterclaim did not state a claim under Section Two of the Sherman Act, it will be dismissed.

### C. The False Advertising Counterclaim

■ In its second counterclaim against Syncsort, Sequential alleged Syncsort falsely advertised its sorting product, SyncSort/UNIX, in violation of § 43(a) ("Section 43(a)") of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).[17] To state a claim for false advertising under the Lanham Act,

[P]laintiffs must allege in their complaint all of the following elements: 1) that the defendant has made false or misleading statements as to his [or her] own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception

---

**16.** In *Matsushita*, American producers alleged their Japanese competitors (the defendants) maintained a monopoly over the Japanese domestic television market and were using the profits derived in Japan to fund a predatory pricing scheme in America. The Supreme Court refused to find an antitrust violation. The Court stated:

Nor does the possibility that [the defendants] have obtained supracompetitive profits in the Japanese market change this calculation. Whether or not [the defendants] have the means to sustain substantial losses in this country over a long period of time, they have no motive to sustain such losses absent some strong likelihood that the alleged conspiracy in this country will eventually pay off.

475 U.S. at 593. Because the defendants were "unlikely to recoup their foregone profits," their conduct did not amount to an antitrust violation. *See Advo*, 51 F.3d at 1203 (citing and interpreting *Matsushita*, 475 U.S. at 593, 106 S.Ct. 1348).

**17.** Section 43 provides, in relevant part:

Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any ... false or misleading description of fact, or false or misleading representation of fact, which—
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or, commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). The Lanham Act was enacted to protect commercial interests; it provides a "private remedy to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising." *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 230 (3d Cir.1990).

is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 872 (3d Cir.1992)(quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922–23 (3d Cir.), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990)); *see Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 129 (3d Cir.1994)("*Johnson & Johnson*"); *Serbin v. Ziebart Int'l Corp.*, 11 F.3d 1163, 1165–66 (3d Cir.1993). There is, however, " 'no requirement that the falsification occur wilfully and with intent to deceive.' " *U.S. Healthcare*, 898 F.2d at 922 (quoting *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir.1958)).

■■■ A plaintiff must plead the advertising is literally false on its face or, if the advertisement is literally true, that the intended audience is left with a false impression of the product. *See Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir.1993); *Ditri*, 954 F.2d at 872; *Sandoz*, 902 F.2d at 227; *U.S. Healthcare*, 898 F.2d at 922; *Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. 1103, 1110 (D.N.J. 1987). If a complaint sufficiently alleges literal falsehood, it need not also allege the buying public was misled. *See Johnson & Johnson*, 19 F.3d at 129. In assessing literal falsehood, the message conveyed by the advertisement must be examined in its full context. *See id.; Castrol*, 987 F.2d at 946 (citing *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 735 F.Supp. 597, 600 (D.Del.), *aff'd*, 902 F.2d 222 (3d Cir.1990)).

■■■ False advertising is distinguishable from nonactionable puffing. "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol*, 987 F.2d at 945. In contrast to "misdescriptions or false representations of specific characteristics of a product," *id.*, mere puffing does not induce reliance on its exaggerated claims. As a result, such language is not deceptive, and is not actionable under Section 43(a). *U.S. Healthcare*, 898 F.2d at 922.

■■■ General claims of product superiority are often deemed an innocuous kind of puffery. *See id.* at 926 (claim of defendant that it was the better health care plan was puffery); *Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F.Supp. 1227, 1234 n. 3 (S.D.N.Y.1990); *Stiffel*, 658 F.Supp. at 1115. By contrast, statements specifically addressing product attributes or statements which are measurable by comparative research are not considered puffing. *See Castrol*, 987 F.2d at 945 (advertisement stating product "outperforms any leading motor oil against viscosity breakdown" was measurable by comparative research and therefore not puffing); *Stiffel*, 658 F.Supp. at 1115 (assertion that " '[defendant's] revolutionary breakthrough in quality finishing technology has been proven in test after test' " found to be measurable and not puffing); *Toro Co. v. Textron, Inc.*, 499 F.Supp. 241, 249–53 & n. 23 (D.Del.1980).

In an ordinary false advertising claim under the Lanham Act, a plaintiff has the burden of proving an advertisement is false or misleading. *See Sandoz*, 902 F.2d at 228–29. The Second Circuit has recognized, however: "[A] plaintiff bears a different burden in proving literally false an advertised claim that tests prove defendant's product superior, than it does in proving the falsity of a superiority claim which makes no mention of tests." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (1992); *see Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 747 F.2d 114, 119 (2d Cir.1984):

■■■ It has been stated that this Circuit has "implicitly recognized" this different burden for so-called "establishment claims," where assertions of product superiority are based upon measurable tests. *See Castrol*, 987 F.2d at 952 (Roth, J., dissenting)(citing majority opinion in *Cas-*

*trol* at 943–44). In such "establishment claim" cases, a plaintiff need only demonstrate the tests relied upon by the defendant do not establish the proposition for which they are cited. *Id.* (quoting *Procter & Gamble Co.*, 747 F.2d at 119)(requiring the plaintiff demonstrate such tests are " 'not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made.' ").

Sequential challenged the veracity of advertisements on two grounds. First, Sequential alleged the Syncsort Website Advertisement, the Syncsort Magazine Advertisement and the Syncsort Mailing Advertisement, all of which promote Syncsort as "the fastest commercial sort product in the world," are false and misleading. *See* False Advertising Counterclaim at ¶¶ 86–94.[18] In response to these allegations, Syncsort argued, *inter alia*, "a generalized claim to be the 'fastest in the world', [sic] without additional qualifications or detail, is meaningless puffery." Moving Brief at 29. It appears, however, Sequential pleaded sufficiently detailed facts which, if proved, indicate the Syncsort Advertisements are more than mere puffery.

■ At the pleading stage, all that is required is that Sequential plead facts demonstrating the assertions of product superiority contained in the Syncsort Advertisements rely on measurable, comparative test results. *See Castrol*, 987 F.2d at 944 (assertion which can be comparatively rated is not puffery); *Stiffel*, 658 F.Supp. at 1115 (where "claims to superiority, flowing as they do from purported independent tests, do more than simply allege general

superiority[,] [they are] not protected as mere puffery"). Sequential pointed to multiple instances in which Syncsort employs measurable tests as ostensible proof of its claim that it is the fastest sort product in the world. *See* False Advertising Counterclaim at ¶ 86 (quoting Syncsort Website Advertisement as stating " 'SyncSort is the fastest commercial sort product in the world .... *It's been proven time and time again in benchmark tests ....*' ")(emphasis added); *see also id.* at ¶ 90 (quoting Syncsort Mailing Advertisement as stating " '*Benchmark tests ... rigorously test SyncSort's design* to ensure that it is the fastest and most efficient sort product on every platform.' ")(emphasis added).

As a second ground for the False Advertising Counterclaim, Sequential alleged:

Upon information and belief, many of the benchmark tests relied on by Syncsort to establish its advertisement claims are flawed. For example, although Syncsort's advertising claim concern its software, the tests are based on performance of the hardware rather than the software.

*Id.* at ¶ 91(a). Sequential further alleged:

Syncsort has never compared its product with PdqSort and therefore SyncSort has not been proven to be the fastest. Tests run by PdqSort show that SyncSort cannot claim to be the 'fastest commercial sort product in the world.'

*Id.* at ¶ 91(b)-(c).

Syncsort argued the statements concerning the benchmark tests are "the un-

---

18. The relevant portions of the Syncsort Advertisements are set forth in the False Advertising Counterclaim. The Syncsort Website Advertisement states, in pertinent part, " 'SyncSort is the fastest commercial sort product in the world. SyncSort provides unmatched sort performance on UNIX systems. It's been proven time and time again in benchmark tests .... [SyncSort made] a new world record.' " False Advertising Counterclaim at ¶ 86 (quoting Syncsort Website Advertisement).

The Syncsort Magazine Advertisement states: " 'Now the world's fastest sort technology has the friendly face of Windows NT.' " *Id.* at ¶ 88 (quoting Syncsort Magazine Advertisement).

The Syncsort Mailing Advertisement states that SyncSort combines the " 'world's fastest sort technology' with a new Windows program. 'Benchmark tests ... rigorously test SyncSort's design to ensure that it is the fastest and most efficient sort product on every platform.' " *Id.* at ¶ 90 (quoting Syncsort Mailing Advertisement).

deniable truth." Moving Brief at 34. Syncsort argued PdqSort was not included in the benchmark testing, and even if PdqSort may have outperformed Sync-Sort/UNIX in a test run by Sequential, "[t]he fact remains that SyncSort/UNIX was the fastest sort in the benchmark tests referred to in its ads." *Id.* at 33.

That a specific competitor is not included in certain tests does not render an otherwise false and misleading advertisement nonactionable. *See Castrol,* 987 F.2d at 946 ("There need not be a direct comparison to a competitor for a statement to be actionable under the Lanham Act.").[19] Even if, as Syncsort argued, Sync-Sort/UNIX did not lose any tests referred to in its advertisements, consumers or potential consumers of sorting products are nevertheless left with the impression that SyncSort/UNIX is superior to all other sorting products, which, by implication, include PdqSort.

Both sophisticated and unsophisticated consumers alike are also given no reason to doubt the benchmark tests referred to in the Syncsort Advertisements actually support the assertion that SyncSort is the fastest sort product in the world. Accepting as true the allegations of Sequential, however, the test results upon which Syncsort based its claims of superiority may prove to be an inaccurate measure of the speed of sorting products. *See id.* at 947 (where test employed by the defendant did not accurately measure viscosity breakdown, advertisement that defendant outperformed other brands in protecting against viscosity breakdown was rendered false and misleading). Sequential pleaded facts which, if proved, demonstrate the benchmark tests of Syncsort do not accurately measure the performance of software. *See* False Advertising Counterclaim at ¶ 91(a); *see also Castrol,* 987 F.2d at 944 n. 5 (the test in defendant's advertisement "is not a credible test upon which [defendant] could reasonably rely for its advertisements."); *Procter & Gamble Co.,* 747 F.2d at 119 (plaintiff need only demonstrate certain tests employed by the defendant are not sufficiently reliable to permit consumers to conclude they establish the assertion in the advertisement).[20]

Sequential has pleaded the essential elements of a false advertising claim under the Lanham Act. *See Ditri,* 954 F.2d 869, 872; *U.S. Healthcare,* 898 F.2d at 922–23. Accordingly, the False Advertising Counterclaim will not be dismissed.

**D.** *Severance of Counterclaims and Stay of Discovery*

In the alternative, Syncsort requests a severance of the counterclaims and a stay

---

**19.** *Castrol* involved an advertisement by the defendant, Pennzoil, which stated, among other things, viscosity breakdown leads to engine failure, and Pennzoil outperforms any leading motor oil against viscosity breakdown. *See Castrol,* 987 F.2d at 946–47. Pennzoil sought to substantiate its claims of superiority by reference to comparative testing. *Id.* at 946. In affirming the findings of the district court that the advertising claims of Pennzoil were literally false, the Third Circuit stated:

> Pennzoil's failure to specifically mention its competitors in the sentence promoting engine protection ... does not render the statement puffery. First, the district court found that the statement compared Pennzoil to its major competitors by necessary implication. Pennzoil stated it is superior to the other brands in protecting against viscosity breakdown, noting that viscosity

breakdown leads to engine problems. It left the consumer with the obvious conclusion that Pennzoil is superior to the other leading brands in protection against engine problems. Therefore, Pennzoil did, by implication, compare its effectiveness against engine wear to that of its competitors ....

*Id.* at 946.

**20.** It is not disputed that Sequential properly pleaded the remaining elements of a false advertising claim under the Lanham Act. *See Ditri,* 954 F.2d at 872. Sequential has properly alleged the advertised goods traveled in interstate commerce. *See* Antitrust Counterclaim at ¶ 73. Sequential also alleged the materiality of the deception in terms of the influence the Syncsort Advertisements have on purchasing decisions. *See* False Advertising Counterclaim at ¶ 94. Lastly, Sequential sufficiently alleged a likelihood of injury as evidenced by "lost sales." *See id.* at ¶ 93.

of discovery. Fed.R.Civ.P. 42(b) governs the bifurcation of issues for trial. Rule 42(b) states, in pertinent part:

> The Court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any cross-claim, counterclaim or third-party claim, or of any separate issues.

Fed.R.Civ.P. 42(b).

In support of its alternative request, Syncsort argued, "Sequential should not be permitted burdensome antitrust-style discovery in an attempt to find some evidence which would support its conclusory claims." Moving Brief at 35. In light of the disposition of the Antitrust Counterclaim, the concerns of Syncsort regarding the complexity and potentially burdensome nature of antitrust claims are moot. The Motion, insofar as it requests a severance of the remaining False Advertising Counterclaim and a stay of discovery, is denied.

*Conclusion*

Based on the foregoing reasons, the Motion is granted in part, and denied in part.